**MDL 2002**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

# BEFORE THE JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE PROCESSED EGG PRODUCTS ANTITRUST LITIGATION | : : : : **MDL Docket No.:** |

## PLAINTIFF ZAZA, INC.'S MOTION FOR TRANSFER AND CONSOLIDATION OF RELATED ANTITRUST ACTIONS PURSUANT TO 28 U.S.C. § 1407

Plaintiff ZaZa, Inc. ("ZaZa"), respectfully moves the Judicial Panel on Multidistrict Litigation (the "Panel"), pursuant to 28 U.S.C. § 1407 and Rule 7.2 of the Rules of Procedure for the Judicial Panel on Multidistrict Litigation (the "MDL Rules"), for an Order transferring all related actions to the United States District Court for the District of Minnesota, the location of the first filed action in this matter.

In support of this motion, and as more fully set forth in the accompanying memorandum, ZaZa avers the following:

1.      To date, two antitrust class actions have been filed alleging an unlawful conspiracy to fix prices in the market for Processed Egg Products ("Processed Eggs") in violation of Section 1 of the Sherman Act.

IMAGED OCT 9  2008        **OFFICIAL FILE COPY**

1

2.     The first-filed civil action is a class action filed in the U.S. District Court for the

District of Minnesota on behalf of all direct purchasers of Processed Egg Products.[1]  Pursuant to

Rule 7.2(a)(ii) of the MDL Rules, a Schedule of Actions for which coordination and

consolidation is requested is submitted concurrently herewith (the "Related Actions").

3.     The Related Actions proposed for transfer and consolidation are based on

substantially similar operative facts and therefore "involve[e] one or more common questions of

fact" as required by 28 U.S.C. § 1407(a).  Common questions of fact are: (1) whether defendants

conspired with the purpose and effect of fixing prices, raising or maintaining the prices of

Processed Eggs, and committing other anticompetitive practices designed to unlawfully fix, raise,

maintain, and stabilize prices of Processed Egg Products in the United States; (2) the identity of

those who participated in the conspiratorial conduct; (3) the duration of the conspiracy; (4) the

effect upon and the extent of injuries sustained by plaintiff and members of the class; and (5) the

appropriate type and/or measure of damages sustained by plaintiff and members of the class.

Transfer of the Related Actions for coordination will prevent duplication of discovery, eliminate

the possibility of conflicting pretrial rulings, and conserve judicial resources.

4.     The U.S. District Court for the District of Minnesota is the most appropriate

forum for coordination or consolidation of the Actions.

5.     The District of Minnesota has ample and experienced judicial resources.

6.     The District of Minnesota is the district with the first filed action.

7.     The District of Minnesota is centrally located and is an accessible and convenient

forum for the parties, witnesses, and counsel.

8.     The District of Minnesota is the principle place of business for both defendant

---

[1]     The caption of the case is *ZaZa, Inc. v. Golden Oval Eggs, LLC, Michael Foods, Inc. and Moark,*

Michael Foods, Inc. and defendant Golden Oval Eggs LLC.  Defendant Moark LLC also has

strong ties to Minnesota.  Land O'Lakes, a Minnesota corporation headquartered in Minnesota,

acquired ownership of Moark LLC in 2006.  Golden Oval purchased Moark's liquid egg

processing assets from Land O'Lakes in 2006.

      9.     The District of Minnesota is equipped with sophisticated state-of-the-art

courtroom technology.

      10.    No action has significantly progressed in any jurisdiction and no judge has gained

any significant experience with any of the Related Actions.

      WHEREFORE, Plaintiff ZaZa, Inc. respectfully requests that the MDL Panel issue an

Order transferring the Related Actions and all subsequently-filed Related Actions to the U.S.

District Court for the District of Minnesota for coordinated or consolidated pretrial proceedings.

Dated:  September 26, 2008           **KAPLAN FOX & KILSHEIMER LLP**


By:  _Jason A Zweig_
      Robert N. Kaplan
      Linda P. Nussbaum
      Jason A. Zweig
      850 Third Avenue, 14th Floor
      New York, NY  10022
      Tel:  (212) 687-1980
      Fax: (212) 687-7114

(..continued)
*LLC*, 0:08-CV-05262 (D. Minnesota), Judge David S. Doty.

W. Joseph Bruckner
Heidi M. Silton
Anna M. Horning Nygren
Craig S. Davis
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Michael E. Criden
Kevin B. Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel: (305) 357-9010
Fax: (305) 357-9050

**Attorneys for Plaintiff ZaZa, Inc.**

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

**BEFORE THE JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

|  |  |  |
|---|---|---|
| **IN RE PROCESSED EGG PRODUCTS ANTITRUST LITIGATION** | : : : : | **MDL Docket No.:** |

**PLAINTIFF ZAZA, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR TRANSFER AND CONSOLIDATION OF RELATED ANTITRUST ACTIONS PURSUANT TO 28 U.S.C. § 1407**

## I.  INTRODUCTION

Pursuant to Rule 7.2(a) of the Rules of Procedure of the Judicial Panel on Multidistrict

Litigation, plaintiff ZaZa, Inc., in *ZaZa, Inc. v. Golden Oval Eggs, LLC, et al.*, 0:08-cv-05262-

DSD-JSM (D. Minn.), filed on September 24, 2008, respectfully submits this memorandum of

law in support of the Motion for Transfer of Related Antitrust Actions to the District of

Minnesota for Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. § 1407.  There are

currently at least two substantially similar antitrust actions pending in two different judicial

districts in the United States.[1]  Plaintiff submits that transfer of all related cases to the District of

Minnesota, Judge David S. Doty, the judge assigned to the *ZaZa* action, is appropriate and will

---

[1]     *See* Schedule of Actions Pursuant to Rule 7.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation submitted concurrently herewith.

1

promote the just, fair and efficient conduct of this litigation, eliminate duplicative discovery, prevent inconsistent judicial rulings, and conserve both judicial and party resources.

## I.    BACKGROUND

### A.    The Basis of the Litigation

The related actions arise from the same basic facts concerning an alleged conspiracy among manufacturers of Processed Egg Products to allocate markets and customers and to fix, raise, maintain or stabilize prices of Processed Egg Products sold in the United States. Processed Egg Products are eggs which come from raw eggs, also called shell eggs, and can be refrigerated liquid, frozen, or dried form as well as specialty products such as wet-pack and dry-pack pre-peeled hard-cooked eggs, either whole, wedged, sliced, chopped or pickled and long rolls of hard-cooked eggs. The three largest producers of Processed Egg Products in the United States are Golden Oval Eggs LLC ("Golden Oval"), Michael Foods Inc. ("Michael Foods"), and Moark LLC ("Moark").

The alleged combination or conspiracy began at least as early as January 1, 2002, but was first made public May 23, 2008, when Michael Foods revealed that it received a grand-jury subpoena requesting documents relating to the pricing, marketing and sale of Processed Egg Products. Each of the three major Processed Egg Products producers – Golden Oval, Michael Foods and Moark – have confirmed that they have received subpoenas covering the years 2002-2008 from the Antitrust Division of the United States Department of Justice concerning their respective Processed Egg Products businesses. According to the disclosures made by Golden Oval, Michael Foods and Moark, the location of the grand jury in this litigation is the Eastern District of Pennsylvania.

**B.     The Related Actions**

Since September 24, 2008, at least two Related Actions have been filed in two different

districts.  The Related Actions share the same core allegations – a conspiracy to fix, raise,

maintain or stabilize prices and to allocate markets and customers in the United States Processed

Egg Product market by the largest manufacturers of these products in violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1.[2]  Further, the Related Actions are all grounded in the

defendants' common disclosures regarding the pending DOJ investigation into the Processed

Egg Products industry.  In addition, the Related Actions seek certification of a class of direct

purchasers of Processed Egg Products and allege identical or substantially similar class periods.

## II.   ARGUMENT

28 U.S.C. § 1407 authorizes the centralization of civil actions pending in different federal

district courts involving common questions of fact in a single federal district court for

coordinated or consolidated pretrial proceedings:[3]

> When civil actions involving one or more common questions of fact are pending
> in different districts, such actions may be transferred to any district for
> coordinated or consolidated pretrial proceedings.  Such transfers shall be made
> by the judicial panel on multidistrict litigation authorized by this section upon its
> determination that transfers for such proceedings will be for the convenience of
> parties and witnesses and will promote the just and efficient conduct of such
> actions.

---

[2]     The complaint in *T.K. Ribbings Family Restaurant v. United Egg Producers*, Inc., 08-cv-
4653 – GP (E.D. Pa.), alleges a conspiracy that also covers fresh shell eggs in addition to
Processed Egg Products.  The *T.K. Ribbings* complaint arises from the same grand jury
investigation as the *ZaZa* complaint and includes as defendants the same defendants in the *ZaZa*
complaint, among others.

[3]     The degree and manner of any coordination or consolidation of transferred proceedings is
within the sole discretion of the transferee court.  *See, e.g., In re General Motors Corp. Secs. &
Derivative Litig.*, 429 F. Supp. 2d 1368, 1370 (J.P.M.L. 2006); *In re Delphi Corp. Secs.,
Derivative & "ERISA" Litig.*, 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005).

For the reasons set forth below, centralization of all of the Related Actions in the District of Minnesota is appropriate.

**A.     Consolidation And Transfer Of The Related Cases To A Single Forum Is Appropriate**

The requirements for centralization of the Related Actions pursuant to 28 U.S.C. § 1407 are satisfied here.  The Related Actions are characterized almost entirely by common questions of fact.  Centralization will promote the just and efficient conduct of the Related Actions, as well as further the convenience of the parties and the witnesses, by eliminating duplicative discovery and the potential for inconsistent rulings, including determinations on class certification.  In the present matter, all related actions should be transferred to the District of Minnesota.

**1.     The Related Actions Are Substantially Similar And Share Common Questions Of Fact**

The Related Actions share many common questions of fact which provide a sufficient basis for consolidating or coordinating the actions in a single forum.  Common questions of fact exist where two or more complaints assert comparable allegations against similar defendants based on similar transactions and events.  *See, e.g., In re Unum Provident Corp. Secs., Derivative & "ERISA" Litig.*, 280 F. Supp. 2d 1377, 1379 (J.P.M.L. 2003) (centralization appropriate where "all actions [could] be expected to focus on a significant number of common events, defendants, and/or witnesses" and "core factual allegations" were consistent among the actions); *In re Japanese Elec. Prods. Antitrust Litig.*, 388 F. Supp. 565, 567 (J.P.M.L. 1975) ("Transfer under § 1407 is not dependent on strict identity of issues and parties but rather on the existence of one or more common questions of fact.").

Among the numerous common questions of fact (and law) at issue in the Related Actions are:

- Whether defendants and their co-conspirators conspired, contracted or combined for the purpose of and with the effect of instituting, raising, fixing, maintaining, or stabilizing the price of Processed Egg Products sold in the United States;

- The identity of the participants in the conspiracy, contract or combination;

- The duration of the conspiracy, contract or combination;

- The nature and character of the acts performed by defendants and their co-conspirators in furtherance of the conspiracy, contract or combination;

- Whether defendants undertook actions to conceal the unlawful conspiracy, contract or combination described herein;

- Whether the conduct of defendants and their co-conspirators violated the relevant federal antitrust laws and caused injury to the business and property of Plaintiff and the Class; and

- The proper measure of damages.

The facts to be determined in each of the Related Actions are nearly identical, making centralization pursuant to 28 U.S.C. § 1407 highly appropriate. *See, e.g., In re Foundry Resins Antitrust Litig.,* 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004) ("[t]hese actions share allegations concerning whether defendants participated in a combination or conspiracy to fix, raise, maintain, or stabilize the price of foundry resins."); *In re Publication Paper Antitrust Litig.,* 346 F. Supp. 2d 1370, 1372 (J.P.M.L. 2004) ("The actions share allegations that the defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize prices for publication paper in violation of federal antitrust laws."); *In re Auto. Refinishing Paint Antitrust Litig.,* 177 F. Supp. 2d 1378, 1379 (J.P.M.L. 2001) ("*Auto Paint*") ("These actions share allegations concerning whether defendants participated in a combination or conspiracy to fix, raise, maintain, or stabilize the price of automotive refinishing paint products."); *In re Cuisinart Food Processor Antitrust Litig.,* 506 F. Supp. 651, 655 (J.P.M.L. 1981) (noting that transferred actions "share[d] numerous

questions of fact concerning the existence *vel non* of alleged conspiracy and its scope, participants, means of operation and effects"); *In re Cement & Concrete Antitrust Litig.,* 437 F. Supp. 750, 752 (J.P.M.L. 1977) (ordering transfer after observing, *inter alia,* "the substantial amount of discovery shared by all actions concerning the existence, scope and effect of conspiratorial activity"); *In re Anthracite Coal Antitrust Litig.,* 436 F. Supp. 402, 403 (J.P.M.L. 1977) (ordering transfer after finding that, "[a]s is often true in multidistrict antitrust actions, the actions . . . raise[d] common factual questions concerning the existence, scope and effect of the alleged conspiracy").

## 2.   Transfer Will Promote The Just And Efficient Conduct Of The Related Actions As Well As Further The Convenience Of The Parties And The Witnesses

The prevalence of common factual allegations and identical legal theories propounded by each plaintiff makes necessary consolidation or coordination of the actions to serve the "convenience of the parties and witnesses and promote the just and efficient conduct" of the litigation. 28 U.S.C. § 1407(a). Centralization will promote the just and efficient conduct of the Related Actions, as well as further the convenience of the parties and the witnesses, by eliminating duplicative discovery, and avoiding inconsistent pretrial rulings. *See* 28 U.S.C. § 1407(a); *see also In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, 416 F. Supp. 2d 1346, 1347 (J.P.M.L. 2006) (centralization "necessary in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings, particularly with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 228 F. Supp. 2d 1379 (J.P.M.L. 2002) (centralization necessary "in order to eliminate duplicative discovery, prevent inconsistent pretrial rulings

6

(especially with respect to class certification matters), and conserve the resources of the parties, their counsel and the judiciary").

Failing to consolidate the Related Actions will likely result in duplicative discovery efforts requiring witnesses to appear for multiple depositions, production of several sets of the same documents by defendants, and third parties to respond to multiple subpoenas from plaintiffs *and* defendants. In light of the overlapping factual allegations of a price-fixing conspiracy and, especially, given that discovery has not yet begun in any of these actions, centralization under § 1407 will avoid duplicative discovery and result in a substantial savings of the time and resources of the parties, counsel and the judiciary. *See In re Am. Family Mut. Ins. Co. Overtime Pay Litig.*, 416 F. Supp. 2d at 1347; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 228 F. Supp. 2d at 1379.

Centralization will also eliminate the possibility of inconsistent rulings on pretrial determinations such as class certification. Where the possibility of inconsistent rulings on class certification issues exists, it is well-settled that centralization is the appropriate course of action. *See, e.g., In re Commercial Money Center, Inc., Equip. Lease Litig.*, 229 F. Supp. 2d 1379, 1380 (J.P.M.L. 2002) (finding that consolidation of 23 actions filed nationwide would prevent inconsistent rulings); *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) (noting that the Panel has "consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists"); *see also, In re Amino Acid Lysine Antitrust Litig.*, 910 F. Supp. 696, 699 (J.P.M.L. 1995) ("Centralization under Section 1407 is thus necessary in order to . . . prevent inconsistent pretrial rulings (especially with respect to class certifications)"); *In re Computervision Corp. Sec. Litig.*, 814 F. Supp. 85, 86 (J.P.M.L. 1993) (holding that transfer is necessary to prevent inconsistent

pretrial rulings, especially regarding class certification); *In re Cement & Concrete Antitrust Litig.*, 437 F. Supp. at 752 ("[S]ince duplicating or overlapping classes are sought in most of the actions, transfer to a single district is desirable in order to avoid the possibility of inconsistent class determinations."); *In re Roadway Express, Inc. Employment Practices Litig.*, 384 F. Supp. 612, 613 (J.P.M.L. 1974) (same).

Where, as here, centralization will avoid duplicative discovery and potentially conflicting pretrial rulings, centralization for coordinated or consolidated pretrial proceedings is warranted to promote the interests of judicial economy and efficiency and to further the convenience of the parties and the witnesses.

**B.     The Related Actions Should Be Transferred To The District of Minnesota**

Transfer of the Related Actions to the District of Minnesota for consolidated or coordinated pretrial proceedings will best serve the convenience of the parties and witnesses and the interests of justice. Among the factors this Panel should consider in determining the appropriate transferee forum are: (1) the location of parties, witnesses and documents and the accessibility of the proposed transferee forum to parties and witnesses; and (2) the extent of the proposed transferee court's experience and familiarity with the types of issues presented. *See, e.g., In re "Factor VIII or XI Concentrate Blood Prods." Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993). These factors favor consolidation and transfer to the District of Minnesota.

**1.     The District of Minnesota Is Geographically Central to Parties, Witnesses and Documents**

The Panel has considered the location of parties, witnesses and documents in selecting a transferee forum. *See, e.g., Auto Paint*, 177 F. Supp. 2d at 1379 (choosing transferee forum, in part, because pertinent documents and witnesses can be expected to be found in [its] vicinity");

*In re Southeast Hotel Props. P'ship Investor Litig.*, 796 F. Supp. 538, 539 (J.P.M.L. 1992)

(selecting transferee forum based on the likelihood that "many relevant witnesses and documents

are likely to be found" there).  The Panel has often stated its preference for consolidation in the

district in which the principal place of business of a defendant, the principal witnesses and

documents are located.  *See, e.g., In re Allegheny Energy, Inc. Sec. Litig.*, 259 F. Supp. 2d 1368,

1369 (J.P.M.L. 2003) (finding Maryland the appropriate transferee district where, among other

things, the defendant was headquartered in Maryland); *In re Am. Family Publishers Bus.*

*Practices Litig.*, Docket No. 1235, slip op. at 2 (J.P.M.L. August 12, 1998) (finding New Jersey

appropriate transferee district where, among other things, documents and witnesses were likely

to be found at the defendant's New Jersey headquarters).

    A considerable portion of the evidence on the claims against the defendants will likely

involve testimony and documents from Minnesota-based defendants Golden Oval and Michael

Foods.  Those witnesses and documents are likely to be found at those companies' headquarters

in the District of Minnesota.  None of the defendant manufacturers of Processed Egg Products or

plaintiffs maintain their principal places of business in the Eastern District of Pennsylvania.[4]

---

[4] The fact that a grand jury has been empanelled in a particular district does not make that
district more convenient than other districts. The Panel has repeatedly rejected the location of a
related grand jury investigation as a dispositive factor in analyzing appropriate transferee forums.
*See, e.g., In re Hydrogen Peroxide Antitrust Litig.,* 374 F.Supp. 2d 1345, 1346 (J.P.M.L. 2005);
*In re Elec. Carbon Products Antitrust Litig.,* 259 F.Supp. 2d 1374, 1376 (J.P.M.L. 2003) (finding
District of New Jersey appropriate transferee forum, despite federal grand jury proceedings in the
Eastern District of Pennsylvania); *In re Corn Derivatives Antitrust Litig.,* 486 F. Supp. 931-932
(J.P.M.L. 1980) (finding District of New Jersey most convenient forum, despite fact that grand
jury investigation in Northern District of California, because all major defendants were
headquartered in the eastern half of the country); *In re Wiring Device Antitrust Litig.,* 444 F.
Supp. 1348, 1350 (J.P.M.L. 1978) (transferring cases to the Eastern District of New York, in
part, because relevant documents and witnesses were there, despite fact that grand jury
documents and government's criminal and civil proceedings were in the District of Connecticut);
*In re Plumbing Fixture Cases,* 295 F. Supp. 33, 34 (J.P.M.L. 1968) (denying motion to transfer
cases to the Western District of Pennsylvania despite fact that conspiracy was carried out, grand
jury was conducted and criminal indictments were returned there).

No other district presents a compelling choice with respect to the location of parties, witnesses and documents.  Further, in the Minneapolis-St. Paul metropolitan area is a geographically central, easily accessible location, a factor that the Panel has given weight in choosing transferee forums.  *See In re Prempro Prods. Liab. Litig.*, 254 F. Supp. 2d 1366, 1368 (J.P.M.L. 2003) (selecting transferee district based, in part, on its geographic centrality); *In re "Factor VIII or XI Concentrate Blood Prods." Prods. Liab. Litig.*, 853 F. Supp. 454, 455 (J.P.M.L. 1993) (same).

The Panel recognized this fact in transferring the *Guidant* litigation to Minnesota:

> Given the varied locations of parties and witnesses in this docket and the geographic dispersal of pending actions, it is clear that a wide array of suitable transferee districts presents itself.  In concluding that the District of Minnesota is an appropriate forum for this docket, we observe that this district, where at least ten actions are already pending before one judge, is a geographically central, metropolitan district equipped with the resources that this complex . . . litigation is likely to require.

*In re Guidant Corp. Implantable Defibrillators Prods. Liability Litig.,* 398 F.Supp. 2d 1371, 1372 (J.P.M.L. 2005).

The District is serviced by the Minneapolis-St. Paul International Airport, which is a major hub for Northwest Airlines.  Further, the downtowns to both Minneapolis and St. Paul are easily accessible from the airport.  In fact, the region's new light rail transit can be taken to within steps of the federal courthouse in Minneapolis.

For the foregoing reasons, the District of Minnesota is the most appropriate transferee district.

2.     **The District of Minnesota Has the Necessary Expertise and Efficiency to Manage This Multidistrict Litigation**

a.     **Expertise**

The District of Minnesota has considerable expertise in dealing with issues presented by complex, multidistrict litigation.  A significant factor favoring transfer to the District of Minnesota is the fact that the first-filed case in this litigation was assigned to Senior Judge David S. Doty, a highly respected and able jurist, experienced in handling challenging litigation.  *See, e.g.*, *McCord v. Minnesota Mut. Life Ins. Co.*, Civ. No. 98-2656 (DSD/JMM), MDL No. 1186.  Judge Doty was sworn in to the federal bench on May 21, 1987 and took senior status on June 30, 1998.  He has previous experience in managing MDL and other complex proceedings, and has done so capably and efficiently.  Judge Doty presided over the multidistrict litigation in *McCord v. Minnesota Mut. Life Ins. Co.* and currently presides over *White v. National Football Leauge*, Civ. No. 92-906, a complex antitrust class action matter.  In both cases Judge Doty has adeptly, effectively and efficiently managed highly complex litigation.  Having done so in these previous cases, as well as in many others, there can be no question as to Judge Doty's ability to manage this multidistrict litigation.

Moreover, judges within the District have efficiently handled numerous MDLs, including, among others, *In re Airline Ticket Commission Antitrust Litig.* (MDL No. 1058), *In re Monosodium Glutamate Antitrust Litig.* (MDL No. 1328), *In re KFC Corp. Fair Labor Standards Act Litig.* (MDL No. 1892), *In re C.H. Robinson Worldwide, Inc. Overtime Pay Litig.* (MDL No. 1849), *In re Viagara Products Liability Litig.* (MDL No. 1724), *In re Guidant Corp. Implantable Defibrillators Products Liability Litig.* (MDL No. 1708), *In re Baycol Product Liability Litig.* (MDL No. 1431), and *In re St. Jude Medical, Inc. Silzone Heart Valves Products Liability Litig.* (MDL No. 1396).

11

The District of Minnesota and Judge Doty clearly have the capability, experience and resources to handle the pending related actions.  The District of Minnesota's exemplary record in managing multidistrict litigation makes it the most appropriate district for transfer and consolidation of the Related Actions.

### b.   Efficiency

In selecting the most appropriate transferee forum for multidistrict litigation, the Panel considers the speed and efficiency with which alternative districts manage their respective caseloads.  Statistics measuring median time from filing to trial of civil actions are strong indicators of how efficiently a Court can manage complex multidistrict litigation.  *See In re Preferential Drug Prods. Pricing Antitrust Litig.*, 429 F. Supp. 1027, 1029 (J.P.M.L. 1977) (transferring cases based in part upon transferee court's low median time between filing and disposition in civil actions); *In re Corn Derivatives Antitrust Litig.*, 486 F. Supp. 929, 932 (J.P.M.L. 1980) (faster docket cited as a consideration for selecting transferee court); *In re Transit Co. Tire Antitrust Litig.*, 350 F. Supp. 1165, 1166 (J.P.M.L. 1972) (transferee district had the lowest median interval from filing of a civil complaint to trial).

As of December 31, 2007, the District of Minnesota had only 854 pending cases per judgeship versus 945 for the Eastern District of Pennsylvania.[5]

| District | Pending Cases Per Judgeship |
|---|---|
| District of Minnesota | 854 |
| Eastern District of Pennsylvania | 946 |

---

[5]   The reports containing the docket statistics making up this chart are found at http://www.uscourts.gov/cgi-bin/cmsd2007.pl.

Another efficiency measure that the Panel has considered is the number of MDL litigations currently pending in a transferee district. *See In re Gator Corp. Software Trademark & Copyright Litig.*, 259 F. Supp. 2d 1378, 1380 (J.P.M.L. 2003) (transferring to a forum that "is not currently overtaxed with other multidistrict dockets"). The District of Minnesota compares very favorably to the Eastern District of Pennsylvania in terms of pending MDL dockets:[6]

| District | Pending MDL Dockets |
|---|---|
| District of Minnesota | 10 |
| Eastern District of Pennsylvania | 19 |

Hence, it is clear that efficiency is best served by transfer to the District of Minnesota.

### c.   Sophisticated, State-of-the-Art Courtroom Technology

Courthouses in the District of Minnesota are equipped with some of the country's finest, sophisticated, state-of-the art courtroom technology. Courtroom features include a 10-inch touch panel control and 15-inch flat panel monitor for the judge, as well as two 15-inch flat panel monitors. The jury is given four 15-inch flat panel monitors in one courtroom and two 20-inch monitors in another. Witnesses are provided an annotation monitor. Technological tools available for evidence presentation include a 5-inch panel control, an annotation monitor, a digital document camera, computer inputs and audio/visual components, including wireless microphones and pink noise to mask bench conferences.

In a case such as this, where technical details of Defendants' alleged anticompetitive conduct is a key issue, technology such as that described above is an important tool to

---

[6]   The statistics used in this chart are found at:
http://www.jpml.uscourts.gov/Docket_Info/PendingMDL-September-08.pdf.

understanding important facts.  For these reasons, the District of Minnesota is an appropriate district for the transfer and consolidation of the Related Actions.

### d.    <u>Existence and Relative Progress of Related Actions</u>

Other factors to be considered include the existence and progress of any related pending litigation, including whether any judge has become particularly familiar with the claims at issue. Here, the Related Actions have all been filed within days of each other.  Consequently, no action has significantly progressed, and no judge has gained any significant experience with any of the Related Actions.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, plaintiff ZaZa, Inc. respectfully submits that the Related Actions should be coordinated or consolidated and transferred to the District of Minnesota.

Dated: September 26, 2008           Respectfully submitted,

**KAPLAN FOX & KILSHEIMER LLP**

By: _____
     Robert N. Kaplan
     Linda P. Nussbaum
     Jason A. Zweig
     850 Third Avenue, 14th Floor
     New York, NY 10022
     Tel: (212) 687-1980
     Fax: (212) 687-7114

W. Joseph Bruckner
Heidi M. Silton
Anna M. Horning Nygren
Craig S. Davis
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Tel: (612) 339-6900
Fax: (612) 339-0981

Michael E. Criden
Kevin B. Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Tel: (305) 357-9010
Fax: (305) 357-9050

**Attorneys for Plaintiff ZaZa, Inc.**

**In re Processed Egg Products Antitrust Litigation**
**Revised Schedule of Cases**

| Caption | Date Filed | Case No. | District | Judge | Cause of Action |
|---------|-----------|----------|----------|-------|-----------------|
| Plaintiffs:<br><br>Zaza, Inc.<br><br>Defendants:<br><br>Golden Oval Eggs LLC, Michael Foods Inc., and Moark LLC | 9/24/2008 | 08cv05262 | District of Minnesota | David S. Doty | Section 1 of the Sherman Act, 15 U.S.C. § 1. |
| Plaintiffs:<br><br>T.K. Ribbings's Family Restaurant<br><br>Defendants:<br><br>United Egg Producers, Inc.,; United Egg Association; United States Egg Marketers, Inc.; Cal-Maine Foods, Inc.; Hillandale Farms of PA., Inc.; Daybreak Foods, Inc.; Golden Oval Eggs, LLC; Michael Foods, Inc.; Michael Foods Egg Products Co.; Midwest Poultry Services, L.P.; Moark LLC, Norco Ranch, Inc.; National Food Corp.; Nucal Foods, Inc.; Rose Acre Farms, Inc.; Pilgrim's Pride Corp. | 9/25/2008 | 08cv4653 | Eastern District of PA | Gene E.K. Pratter | Section 1 of the Sherman Act, 15 U.S.C. § 1. |

RECEIVED
CLERK'S OFFICE

2008 OCT -2 A 10: 18

JUDICIAL PANEL ON
MULTIDISTRICT
LITIGATION

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

1



JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

## REVISED CERTIFICATE OF SERVICE

I, Roseann Kelly, hereby certify that true and correct copies of the Motion of Plaintiff

ZaZa, Inc. For Transfer of Related Antitrust Actions to the District of Minnesota For Consolidated

Pretrial Proceedings Pursuant to 28 U.S.C. Section 1407; Memorandum of Law of Plaintiff ZaZa,

Inc. in Support of Motion For Transfer of Related Antitrust Actions to the District of Minnesota

For Consolidated Pretrial Proceedings Pursuant to 28 U.S.C. Section 1407; Revised Schedule of

Related Actions; and Revised Certificate of Service were served upon the following parties via

First Class mail service on October 1, 2008:

United Egg Producers, Inc.
1720 Windward Concourse, #230
Alpharetta, GA 30005

*Defendant*

United Egg Association
1720 Windward Concourse, #230
Alpharetta, GA 3005

*Defendant*

United States Egg Marketers, Inc.
1720 Windward Concourse, #230
Alpharetta, GA 30005

*Defendant*

Cal-Maine Foods, Inc.
3320 Woodrow Wilson Avenue
Jackson, MS 39207

*Defendant*

Hillandale Farms of PA, Inc.
3rd and Crooked Run Road
North Versailles, PA 15137

*Defendant*

JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

2008 OCT -2 A 10: 18

RECEIVED
CLERK'S OFFICE

1

Daybreak Foods, Inc.
533 Tyranena Park Road
PO Box 800
Lakeville, MN 56284

*Defendant*

Michael Foods Egg Products Co.
301 Carlson Pkwy., Ste. 400
Minnetonka, MN 55305

*Defendant*

Midwest Poultry Services, LP.
9951 West State Rd. 25
Mentone, IN 4539

*Defendant*

Norco Ranch, Inc.
1811 Mountain Avenue
Norco, CA 92860

*Defendant*

National Food Corp.
1930 Merrill Creek Pkwy #A
Everett, WA 98203

*Defendant*

Nucal Foods, Inc.
720 S. Stockton Avenue
Ripon, CA 95366

*Defendant*

Rose Acre Farms, Inc.
6874 N Base Rd.
Seymour, IN 47274

*Defendant*

Pilgrim's Pride Corp.
4845 US Highway 271 N.
Pittsburg, TX 75686

*Defendant*

W. Joseph Bruckner
Heidi M. Silton
Anna M. Horning
Craig S. Davis
Lockridge Grindal Nauen P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
612-339-6900
612-339-0981

*Counsel for Plaintiff ZAZA, Inc.*

Michael E. Criden
Kevin B. Love
Criden & Love, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
305-357-9010
305-357-9050
*Counsel for Plaintiff ZAZA, Inc.*
And a Copy of the Revised Schedule of Cases and Revised Certificate of Service were served by
First Class mail upon:

Michael E. Kunz
Clerk of Court
United States District Court
Eastern District of Pennsylvania
James A. Byrne Federal Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797
Phone: (215) 597-7704
Fax: (215) 597-6390

Richard D. Sletten
Clerk of Court
United States District Court
District of Minnesota
300 South Fourth Street, Suite 202
Minneapolis, MN 55415

Michael D. Hausfeld
James J. Pizzirusso
COHEN, MILSTEIN, HAUSFELD
& TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  202-408-4600
Fax:  202-408-4699

*Attorneys for Plaintiff T.K. Ribbing's Family Restaurant*

Brent W. Landau
Pennsylvania Bar No. 202189
COHEN, MILSTEIN, HAUSFELD
& TOLL P.L.L.C.
255 S. 17th Street, Suite 1307
Philadelphia, PA  19103
Tel:  267-773-4680
Fax:  267-773-4690

*Attorneys for Plaintiff T.K. Ribbing's Family Restaurant*

Steven A. Kanner
FREED KANNER LONDON
& MILLEN LLP
2201 Waukegan Road, Suite 130
Bannockburn, IL  60015
Tel:  224-632-4500
Fax:  224-632-4521

*Attorneys for Plaintiff T.K. Ribbing's Family Restaurant*

Arthur N. Bailey
ARTHUR N. BAILEY & ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY  14701
Tel:  716-664-2967
Fax:  716-664-2983

*Attorneys for Plaintiff T.K. Ribbing's Family Restaurant*

Michael Foods, Inc.
Attn: Legal Counsel
301 Carlson Parkway
Suite 400 Minnetonka, MN  55305
Tel:  952-258-4000

*Defendant*

Golden Oval Eggs, LLC
Attn: Legal Counsel
1800 Park Avenue East
P.O. Box 615
Renville, MN  56284
Tel:  320-329-8182

*Defendant*

Moark LLC
Attn: Legal Counsel
1811 Mountain Avenue
P.O. Box 910
Norco, CA  92860
Tel:  866-757-3447

*Defendant*

Roseann Kelly

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

1

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

OCT - 9 2008

FILED
CLERK'S OFFICE

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ZAZA, INC., on behalf of itself and all others similarly situated,<br><br>      **Plaintiff,**<br><br>  v.<br><br>**GOLDEN OVAL EGGS LLC, MICHAEL FOODS INC., and MOARK LLC**<br><br>      **Defendants.** | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMAND** |

### CLASS ACTION COMPLAINT

Plaintiff, individually, and on behalf of a class of all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against Defendants, demanding a trial by jury, and complaining and alleging as follows:

### Nature of The Case

1. This lawsuit is brought as a class action on behalf of Plaintiff and all individuals and entities who purchased Processed Egg Products (defined herein) in the United States directly from Defendants, their predecessors, parents, or controlled subsidiaries and affiliates from at least as early as January 1, 2002 through May 31, 2008 ("Class Period").  Plaintiff alleges that during the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize the prices

386274-1

of Processed Egg Products. Because of Defendants' unlawful conduct, Plaintiff and other class members paid artificially inflated prices for Processed Egg Products and, as a result, have suffered antitrust injury to their business or property.

2.     Defendants Golden Oval Eggs LLC, Michael Foods Inc. and MoArk LLC are the top manufacturers of Processed Egg Products in the United States. During the Class Period, the prices for Processed Egg Products have risen disproportionately to the prices of input costs and the rise in prices cannot be explained by the laws of supply and demand.

## JURISDICTION AND VENUE

3.     This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by Plaintiff and the members of the class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.     This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

5.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

6.     Venue is found in this district pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d).

Venue is proper in this judicial district because during the Class Period one or more of the defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

7.    Defendants, on information and belief, maintain offices, have agents, transact business, or are found within this judicial district.

## PLAINTIFF

8.    Plaintiff ZAZA, Inc. ("ZAZA" or "Plaintiff") is a Florida corporation with its principal place of business located 3975 NW 4th Street, Miami, Florida 33126. During the Class Period, Plaintiff purchased Processed Egg Products from one or more of the defendants. The prices paid for the Processed Egg Products that Plaintiff paid to defendants were, as a result of the conspiracy herein alleged, higher than they otherwise would have been, and as a result of the alleged conspiracy, Plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

## DEFENDANTS

9.    Defendant Golden Oval Eggs LLC ("Golden Oval") is a Delaware corporation with its principal place of business at 1800 Park Avenue East, P.O. Box 615, Renville, Minnesota 56284. Golden Oval operates 7 production and/or distribution facilities in the U.S. It produces a wide range of egg products, including liquid eggs, whites & yolks, and further processed egg products for sale

to other food manufacturers, retailers, food service customers, restaurants,

supermarkets & food distributors.  Golden Oval is a leader in the liquid egg

industry, serving customers throughout the United States and Canada.  In 2006, it

was ranked among the top 10 producers and processors.  As of May 31, 2008,

Golden Oval's net sales for 2008 were $165,187,000.  Golden Oval marketed

and/or sold Processed Egg Products in this district and the United States during

the Class Period.

10.     Defendant Michael Foods, Inc. ("Michael Foods") is a Delaware

corporation with its principal place of business at 301 Carlson Parkway, Suite

400, Minnetonka, Minnesota 55305.  Michael Foods is a principal provider of

Processed Egg Products.  Defendant Michael Foods marketed and/or sold

Processed Egg Products in this district and the United States during the Class

Period.  Michael Foods is the largest North American producer of processed eggs

and has a 45% share of the market.  Michael Foods is also the largest global

supplier of processed eggs with 2007 sales of $1.6 billion.

11.     Defendant MoArk LLC ("MoArk") is a unit of Land O' Lakes Inc.

MoArk has facilities in Norco, California, Neosho, Missouri, and Bozrah,

Connecticut.   Defendant MoArk marketed and/or sold Processed Egg Products in

this district and the United States from at least 2002 through 2006.  In 2006,

MoArk sold its liquid egg processing assets to defendant Golden Oval.  In 2006,

Land O'Lakes acquired 100% of the ownership of MoArk, LLC.  MoArk's

Corporate Office is located at 1811 Mountain Avenue, PO Box 910, Norco, CA
92860.

     12.     Whenever in this Complaint reference is made to any act, deed or

transaction of any corporation, the allegation means that the corporation engaged

in the act, deed or transaction by or through its officers, directors, agents,

employees or representatives while they were actively engaged in the

management, direction, control or transaction of the corporation's business or

affairs.

## CO-CONSPIRATORS

     13.     Various other persons, firms and corporations, not named as

defendants in this complaint, have participated as co-conspirators with defendants

in the violations alleged herein, and aided, abetted and performed acts and made

statements in furtherance of the conspiracy.

## PROCESSED EGG PRODUCTS

     14.     "Processed Egg Products", as used herein, are the eggs which come

from raw eggs, also called shell eggs, and can be in refrigerated liquid, frozen, or

dried form as well as specialty products such as wet-pack and dry-pack pre-peeled

hard-cooked eggs, either whole, wedged, sliced, chopped or pickled and long rolls

of hard-cooked eggs. Processed Egg Products are preferred to shell eggs by

commercial bakers, food manufacturers and the foodservice industry because they

have many advantages including convenience, labor savings, minimal storage

requirements, ease of portion control, and product quality, stability and uniformity.

Convenience foods such as cake and pudding mixes, pasta, ice cream, mayonnaise, candies and bakery goods, among others, utilize Processed Egg Products.

15.    Processed Egg Products are sold to other food manufacturers, restaurants, supermarkets and food service distributors.

16.    Processed Egg Products are homogenous commodity products. Processed Egg Products supplied by one producer may be readily substituted for Processed Egg Products supplied by any other supplier.  As a result, buyers make purchase decisions based largely, if not entirely, on price.

17.    The Processed Egg Product industry is a highly concentrated industry and has limited suppliers.  The defendants named herein, supply the majority of Processed Egg Products in the United States.

18.    The Processed Egg Products industry has substantial barriers to entry including the cost of the equipment necessary to manufacture Processed Egg Products.  Such barriers are conducive to a conspiracy because they protect existing suppliers from competition and perpetuate the high market concentration.

## GOVERNMENT ANTITRUST INVESTIGATION

19.    It has been recently revealed that the United States Department of Justice is conducting a criminal investigation into the Processed Egg Products industry.  In July 2008, Golden Oval made the following disclosure in its form 10Q it filed with the SEC:

On March 27, 2008, we received a subpoena from the U.S.
Department of Justice, through the U.S. Attorney for the
Eastern District of Pennsylvania, requesting documents for
the period of January 1, 2002 through March 27, 2008
relating primarily to the pricing, marketing, and sales of our
egg products.  We intend to fully cooperate with the
Department of Justice request.  We cannot predict what, if
any, impact this inquiry and any results from this inquiry
could have on our current or future operations or results of
operations.

20.    In May 2008, Michael Foods also disclosed in its 10Q that it, along

with a subsidiary, had received subpoenas from the U.S. Department of Justice

requesting documents for the period of January 1, 2002 through March 27, 2008

relating to "pricing, marketing, and sales of our egg products."

21.    Separately, defendant MoArk also confirmed that it had received a

subpoena in connection with the DOJ's investigation.

## CLASS ACTION ALLEGATIONS

22.    Plaintiff brings this action on behalf of itself and as a class action

under the provisions of Rule 23(a) and (b)(2) & (b)(3) of the Federal Rules of

Civil Procedure on behalf of all members of the following class:

All persons (excluding governmental entities,
defendants, co-conspirators, other sellers or providers
of Processed Egg Products, and the present and former
parents, predecessors, subsidiaries and affiliates of the
foregoing) who purchased Processed Egg Products
directly from any of the defendants, or any present or
former parent, subsidiary or affiliate thereof, at any
time during the period from at least January 1, 2002
through May 31, 2008.

23.    Plaintiff believes that there are hundreds or thousands of class members as above described, the exact number and their identities being known by defendants.

24.    The class is so numerous and geographically dispersed that joinder of all members is impracticable.

25.    There are questions of law and fact common to the class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether defendants engaged in a combination and conspiracy among themselves to allocate the market for or engage in other anticompetitive conduct concerning Processed Egg Products.

b.    The identity of the participants in the conspiracy;

c.    The duration of the conspiracy alleged in this complaint and the nature and character of the acts performed by defendants in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    Whether the conduct of defendants, as alleged in this complaint, caused injury to the business and property of Plaintiff and other members of the class;

f.    The effect of defendants' conspiracy on the prices of

Processed Egg Products sold during the Class Period; and

g.    The appropriate measure of damages sustained by Plaintiff

and other members of the class.

26.    Plaintiff is a member of the class, Plaintiff's claims are typical of the

claims of the class members, and Plaintiff will fairly and adequately protect the

interests of the members of the class.

27.    Plaintiff will fairly and adequately assert and protect the interests of

the class.

28.    Plaintiff's interests are coincident with and not antagonistic to those

of the other members of the class.

29.    Plaintiff is represented by counsel who is competent and experienced

in the prosecution of antitrust and class action litigation.

30.    A class action provides a fair and efficient method for the

adjudication of the controversy for the following reasons.

31.    The prosecution of separate actions by individual members of the

class would create a risk of inconsistent or varying adjudications.

32.    Defendants have acted, and refused to act, on grounds generally

applicable to the class, thereby making appropriate final injunctive relief with

respect to the class as a whole.

33.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

34.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require.  Class treatment will also permit the adjudication of relatively small claims by many class members who could not afford individually to litigate an antitrust claim such as that asserted herein.  There are no difficulties likely to be encountered in the management of this class action that would preclude its maintenance as a class action and no superior alternative exists for the fair and efficient adjudication of this controversy on behalf of Plaintiff and the members of the Class.

## TRADE AND COMMERCE

35.     The activities of defendants, as described in this complaint, were within the flow of, and substantially affected, interstate commerce.

36.     During the time period covered by this complaint, defendants marketed and/or sold Processed Egg products.

37.     Defendants, and each of them, have used instrumentalities of interstate commerce to market and/or sell Processed Egg Products.

38.    Defendants have marketed and/or sold Processed Egg Products in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states in which defendants market and sell such services.

### FRAUDULENT CONCEALMENT

39.    Plaintiff had no knowledge of defendants' unlawful self-concealing conspiracy and could not have discovered the contract, combination or conspiracy until at least May 2008 by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by defendants to avoid detection of, and fraudulently conceal, their contract, combination or conspiracy. In May and June 2008, respectively, defendants Golden Oval and Michael Foods disclosed, in quarterly filing with the Securities and Exchange Commission, that they had each received a subpoena from the Department of Justice requesting documents for the period of January 1, 2002 through March 27, 2008 relating, "primarily to the pricing, marketing, and sales of our egg products."

40.    Because the contract, combination or conspiracy was kept secret by defendants, Plaintiff was unaware of the anticompetitive conduct concerning Processed Egg Products that were secretly agreed upon as alleged herein. It was not until at least May 2008, that Plaintiff became aware, or could have become aware with the exercise of reasonable diligence, of defendants' anticompetitive conduct.

41.     As a result of the fraudulent concealment of the conspiracy, Plaintiff

asserts the tolling of the applicable statute of limitations affecting the right of

action by Plaintiff.

## COUNT I

### Violation of Sherman Act § 1, 15 U.S.C. § 1

42.     Plaintiff incorporates by reference, as if fully set forth herein, the

allegations contained in the preceding paragraphs of this complaint.

43.     Beginning at least as early as January 1, 2002, the exact date being

unknown to Plaintiff and exclusively within the knowledge of defendants,

defendants and their co-conspirators entered into a continuing combination or

conspiracy to unreasonably restrain trade and commerce in violation of Section 1

of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating

competition in the United States for Processed Egg Products.

44.     In particular, defendants have combined and conspired to raise, fix,

maintain and stabilize the prices of Processed Egg Products sold in the United

States.

45.     As a result of defendants' unlawful conduct, prices for Processed

Egg Products were raised, fixed, maintained and stabilized in the United States.

46.     For purposes of formulating and effectuating their combination or

conspiracy, defendants and their co-conspirators did those things they combined or

conspired to do, including:

    a.      Participating in meetings and conversations to discuss the prices and supply of Processed Egg Products;

    b.      Communicating in writing and orally to fix prices;

    c.      Agreeing to manipulate the prices and supply of Processed Egg Products sold in the United States;

    d.      Issuing price announcements and price quotations in accordance with the agreements reached;

    e.      Selling Processed Egg Products to customers in the United States at non-competitive prices; and

    f.      Providing false statements to the public to explain increased prices for Processed Egg Products.

47.    As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have been injured in their businesses and property in that they have paid more for Processed Egg Products than they otherwise would have paid in the absence of defendants' unlawful conduct.

48.    As a direct and proximate result of defendants' scheme, Plaintiff and the members of the class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiff's injuries consist of paying higher prices to purchase Processed Egg Products than it would have paid absent defendants' conduct.  Plaintiff's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes defendants' conduct unlawful.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff requests:

A.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure.

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by defendants, be adjudged to have been in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    That judgment be entered for Plaintiff and members of the class against defendants for three times the amount of damages sustained by Plaintiff and the class as allowed by law, together with the costs of this action, including reasonable attorneys' fees.

D.    That defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, continuing to engage in the anticompetitive conduct described herein.

E.    That Plaintiff and members of the class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

## Jury Trial Demand

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of the claims asserted in this complaint so triable.

386274-1                                    14

DATED:  September 24, 2008          Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN P.L.L.P.


By: _____
        W. Joseph Bruckner (#147758)
        Heidi M. Silton (#25759X)
        Anna M. Horning Nygren (#0386514)
        Craig S. Davis (#0148192)
100 Washington Avenue South, Suite 2200
Minneapolis, MN  55401
Telephone:   612-339-6900
Facsimile:    612-339-0981
Email: wjbruckner@locklaw.com
        hmsilton@locklaw.com
        amhorningnygren@locklaw.com
        csdavis@locklaw.com


Robert N. Kaplan
Linda P. Nussbaum
Jason Zweig
Christine M. Fox
KAPLAN FOX & KILSHEIMER
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
Email: rkaplan@kaplanfox.com
        lnussbaum@kaplanfox.com
        jzweig@kaplanfox.com
        cfox@kaplanfox.com


Michael E. Criden
Kevin B. Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9010
Facsimile: (305) 357-9050
Email: mcriden@cridenlove.com
        klove@cridenlove.com

*Counsel for Plaintiff ZAZA, Inc.*

2

**GP**

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| T.K. RIBBING'S FAMILY RESTAURANT<br>153 WEST MAIN ST.<br>FALCONER, NY 14733<br><br>On Behalf of Itself and All<br>Others Similarly Situated,<br><br>      Plaintiff,<br>      v.<br><br>UNITED EGG PRODUCERS, INC.<br>1720 WINDWARD CONCOURSE, #230<br>ALPHARETTA, GA 30005<br><br>UNITED EGG ASSOCIATION<br>1720 WINDWARD CONCOURSE, #230<br>ALPHARETTA, GA 30005<br><br>UNITED STATES EGG MARKETERS, INC.<br>1720 WINDWARD CONCOURSE, #230<br>ALPHARETTA, GA 30005<br><br>CAL-MAINE FOODS, INC.<br>3320 WOODROW WILSON AVE<br>JACKSON, MS 39207<br><br>HILLANDALE FARMS OF PA., INC.<br>3RD & CROOKED RUN ROAD<br>NORTH VERSAILLES, PA 15137<br><br>DAYBREAK FOODS, INC.<br>533 TYRANENA PARK ROAD<br>PO BOX 800<br>LAKE MILLS, WI 53551<br><br>GOLDEN OVAL EGGS, LLC<br>1800 PARK AVE. EAST<br>RENVILLE, MN 56284<br><br>MICHAEL FOODS, INC.<br>301 CARLSON PKWY., STE. 400<br>MINNETONKA, MN 55305 | CIVIL ACTION NO._____<br><br>COMPLAINT - CLASS ACTION<br><br>JURY TRIAL DEMANDED<br><br>08  4653 |



MICHAEL FOODS EGG PRODUCTS CO.          )
301 CARLSON PKWY., STE. 400             )
MINNETONKA, MN 55305                    )
                                        )
MIDWEST POULTRY SERVICES, L.P.          )
9951 WEST STATE RD 25                   )
MENTONE, IN 46539                       )
                                        )
MOARK LLC                               )
1811 MOUNTAIN AVE.                      )
NORCO, CA 92860                         )
                                        )
NORCO RANCH, INC.                       )
1811 MOUNTAIN AVE                       )
NORCO, CA 92860                         )
                                        )
NATIONAL FOOD CORP.                     )
1930 MERRILL CREEK PKWY #A              )
EVERETT, WA 98203                       )
                                        )
NUCAL FOODS, INC.                       )
720 S STOCKTON AVE                      )
RIPON, CA 95366                         )
                                        )
ROSE ACRE FARMS, INC.                   )
6874 N BASE RD                          )
SEYMOUR, IN 47274                       )
                                        )
PILGRIM'S PRIDE CORP.,                  )
4845 US HIGHWAY 271 N                   )
PITTSBURG, TX 75686                     )
                                        )
        Defendants.                     )
_____)

## CLASS ACTION COMPLAINT

Plaintiff, T.K. Ribbings Restaurant, on behalf of itself and all others similarly situated, by its undersigned attorneys, bring this action for treble damages and injunctive relief, as well as attorneys' fees and costs, under the antitrust laws of the United States against the defendants named herein, and upon information and belief, and in connection therewith allege as follows:

## NATURE OF THE CASE

1.      This action is brought as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the plaintiff class consisting of all persons and entities who purchased "shell eggs" or "egg products" produced from caged birds (collectively referred to herein as "eggs") directly from any of the defendants or any of their co-conspirators during the period from January 1, 2000, through the present (the "Class Period").

2.      Since at least 2000 and continuing to the present, the United Egg Producers ("UEP"), the largest egg trade organization in the United States (representing approximately 96 percent of domestic egg producers), its members and nonmember co-conspirators (collectively "the cartel") have combined and conspired to fix, raise, maintain and stabilize the prices at which eggs were sold in the United States during the Class Period.  The aim of defendants' conspiracy was to conduct a supply control campaign designed to reduce output and artificially fix and inflate the price of eggs in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. Because of defendants' unlawful conduct, plaintiff and the other class members were injured and paid artificially inflated prices for eggs purchased from defendants during the Class Period.

3.      Defendants combined and conspired to collectively reduce the supply of eggs available for sale in the United States during a time of increased demand, which allowed defendants to drastically increase the price of eggs from 2000 to record highs by 2007 and into 2008.  Further, as a result of their conspiracy, defendants have realized record profits.

4.      During the Class Period, defendants conspired to, and did reduce and constrain the supply of eggs in at least the following seven ways:

(a)      agreeing to reduce the total number of hens at laying farms by increasing cage space, but agreeing not to replace hens lost through the increases;

(a)     agreeing to manipulate the molting of hens to keep egg production low;

(b)     agreeing to delay or reduce chick hatching;

(c)     agreeing to reduce inventory and/or to not expand operations;

(d)     agreeing to restrain output in the United States;

(e)     manipulating the export of eggs to reduce supply; and

(f)     fixing prices through a horizontal agreement to restrain output.

5.     These coordinated efforts by defendants reduced the supply of eggs, which allowed for the meteoric rise of egg prices over the last several years and permitted those prices to remain at supracompetitive levels throughout the Class Period.

## JURISDICTION AND VENUE

6.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for treble damages and injunctive relief, as well as reasonable attorneys' fees and costs, with respect to the injuries sustained by plaintiff and the members of the Class arising from violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a) and 15 U.S.C. §§ 15 and 26.

7.     The defendants are trade groups, their members, and co-conspirators.  These entities are involved in the promotion, production, processing, and/or sale of shell eggs and egg products in interstate commerce.  The defendants' activities in the promotion, production, processing, and/or sale of shell eggs and egg products affect interstate commerce.

8.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c), because during the Class Period many of the defendants resided, transacted

4

business, were found, or had agents in this district and because a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## THE PARTIES

### A.    PLAINTIFF

9.      Plaintiff T.K. Ribbing's Family Restaurant is a New York corporation with its principal place business located in Falconer, New York.  During the Class Period, Plaintiff purchased egg products directly from one or more of the defendants.

### B.    DEFENDANTS

10.      Defendant United Egg Producers, Inc. ("UEP") is a cooperative corporation organized, existing, and doing business under the laws of the State of Maine with its office and principal place of business in Alpharetta, Georgia.

11.      Defendant United Egg Association ("UEA") is a nonprofit corporation organized, existing, and doing business under the laws of the District of Columbia, with its offices and principal place of business located in Alpharetta, Georgia.

12.      Defendant United States Egg Marketers, Inc. ("USEM") is a nonprofit corporation organized, existing, and doing business under the laws of the State of Georgia, with its offices and principal place of business located in Alpharetta, Georgia.

13.      Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Jackson, Mississippi.  During the Class Period, Cal-Maine sold eggs to purchasers in the United States, including members of the class.

14.      Defendant Hillandale Farms of PA., Inc. ("Hillandale") is a corporation organized, existing, and doing business under the laws of the state of Pennsylvania, with its

offices and principal place of business located in North Versailles, Pennsylvania. During the

Class Period, Hillandale sold eggs to purchasers in the United States, including members of the

class.

15.     Defendant Daybreak Foods, Inc. ("Daybreak Foods") is a corporation organized,

existing, and doing business under the laws of the State of Wisconsin with its offices and

principal place of business located in Lake Mills, Wisconsin. During the Class Period, Daybreak

Foods sold eggs to purchasers in the United States, including members of the class.

16.     Defendant Golden Oval Eggs, LLC ("Golden Oval Eggs") is a limited liability

company organized, existing, and doing business under the laws of the State of Delaware with its

offices and principal place of business located in Rennville, Minnesota. During the Class Period,

Golden Oval Eggs sold eggs to purchasers in the United States, including members of the class.

17.     Defendant Michael Foods, Inc. ("Michael Foods") is a corporation organized,

existing, and doing business under the laws of the State of Delaware, with its offices and

principal place of business located in Minnetonka, Minnesota.  During the Class Period, Michael

Foods sold eggs to purchasers in the United States, including members of the class.

18.     Defendant Michael Foods Egg Products Co. ("Michael Foods Egg Products") is a

corporation organized, existing, and doing business under the laws of the State of Delaware, with

its offices and principal place of business located in Minnetonka, Minnesota.  During the Class

Period, Michael Foods Egg Products sold eggs to purchasers in the United States, including

members of the class.

19.     Defendant Midwest Poultry Services, L.P. ("Midwest Poultry Services") is a

limited partnership organized, existing, and doing business under the laws of the State of

Indiana, with its offices and principal place of business located in Mentone, Indiana.  During the

6

Class Period, Midwest Poultry Services sold eggs to purchasers in the United States, including members of the class.

20.     Defendant Moark LLC ("Moark") is a limited liability company organized, existing, and doing business under the laws of the State of Missouri, with its offices and principal place of business located in Norco, California.  During the Class Period, Moark sold eggs to purchasers in the United States, including members of the class.

21.     Defendant Norco Ranch, Inc. ("Norco Ranch") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Norco, California.  During the Class Period, Norco Ranch, sold eggs to purchasers in the United States, including members of the class.

22.     Defendant National Food Corporation ("National Food") is a corporation organized, existing, and doing business under the laws of the State of Washington with its offices and principal place of business located in Everett, Washington.  During the Class Period, National Food Corporation sold eggs to purchasers in the United States, including members of the class.

23.     Defendant NuCal Foods, Inc. ("NuCal Foods") is a corporation organized, existing, and doing business under the laws of the State of California, with its offices and principal place of business located in Ripon, California.  During the Class Period, NuCal Foods sold eggs to purchasers in the United States, including members of the class.

24.     Defendant Rose Acre Farms, Inc. ("Rose Acre Farms") is a corporation organized, existing, and doing business under the laws of the State of Indiana, with its offices and principal place of business located in Seymour, Indiana.  During the Class Period, Rose Acre Farms sold eggs to purchasers in the United States, including members of the class.

7

25.     Defendants Pilgrim's Pride Corp. ("Pilgrim's Pride") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business located in Pittsburg, Texas.  During the Class Period, Pilgrim's Pride Corp. sold eggs to purchasers in the United States, including members of the class.

26.     The acts charged in this Complaint have been done by the aforesaid defendants and were ordered and performed by the aforesaid defendants' officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of said defendants' business or affairs.

## UNNAMED CO-CONSPIRATORS

27.     Various individuals, partnerships, corporations and associations not named as defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

28.     At all relevant times, cage producers, egg trade groups, egg farm software companies, or other entities, referred to herein as "co-conspirators," as well as various other persons, companies, and corporations, the identities of which are presently unknown, willingly conspired with Defendants in their unlawful restraint of trade as described herein.

29.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered, or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

30.     All averments herein against any named Defendant are also averred against these unnamed co-conspirators as though set forth at length.

## CLASS ACTION ALLEGATIONS

31.     Plaintiff brings this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal

Rules of Civil Procedure on behalf of the following plaintiff Class:

> All individuals and entities that purchased "shell eggs" or "egg
> products" produced from caged birds in the United States directly
> from defendants or their co-conspirators during the Class Period
> from January 1, 2000 through the present. Excluded from the
> Class are the defendants, their co-conspirators, and their respective
> parents, subsidiaries and affiliates, as well as any government
> entities.

32.     The Class is so numerous that joinder of all members thereof is impracticable.

Indeed, plaintiff avers, on information and belief, that during the Class Period, thousands of

persons and entities located throughout the United States purchased these eggs from the

defendants.

33.     Plaintiff's claims are typical of the claims of the members of the Class because

plaintiff and all Class members were damaged by the same wrongful conduct of the defendants

and their co-conspirators as alleged in this Complaint.

34.     Plaintiff will fairly and adequately protect the interests of the Class.  The interests

of plaintiff are coincidental with, and not antagonistic to, those of other members of the Class.  In

addition, plaintiff is represented by counsel experienced and competent in the prosecution of

complex class action and antitrust litigation.

35.     There are questions of law and fact common to plaintiff and members of the Class

and those common questions predominate over any questions which may affect only individual

members of the Class, because defendants have acted on grounds generally applicable to the

entire Class.  Among the predominant questions of law and fact common to the Class are:

9

    (a)      Whether the defendants and their co-conspirators engaged in a combination or conspiracy to raise, fix and maintain prices of eggs sold in the United States;

    (b)      The duration and extent of the combination or conspiracy alleged herein;

    (c)      Whether the defendants and their co-conspirators were participants in the combination or conspiracy alleged herein;

    (d)      Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

    (e)      The effect of the combination or conspiracy upon the prices of eggs sold in the United States during the Class Period;

    (f)      Whether the conduct of the defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of plaintiff and the other members of the Class; and

    (g)      The appropriate measure of damages sustained by plaintiff and other members of the Class.

36.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many class members who could not afford individually to litigate an antitrust claim such as that asserted herein. There are no difficulties likely to be encountered in

the management of this class action that would preclude its maintenance as a class action and no better alternative exists for the fair and efficient adjudication of this controversy.

## CONCEALMENT AND TOLLING

37.     Throughout the relevant period, Defendants have affirmatively concealed from Plaintiff and class members the unlawful combination, conspiracy and agreement among Defendants alleged herein.  Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy through non-public means, agreed not to discuss or disclose the details of their conspiracy, and falsely represented to Plaintiff and class members that the prices they paid for eggs were fair and competitive.

38.     Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives.

39.     Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, which they exercised, the unlawful conduct alleged herein at the time it occurred.

## FACTUAL BACKGROUND

## A.     EGG PRODUCTION, TRADE AND COMMERCE

### 1.     The Domestic Egg Market

40.     Egg consumption can be divided into two sectors – the "shell egg" sector and the "egg products" (including "liquid eggs") sector.[1]

41.     The shell egg sector produces "table eggs" for immediate consumption.  Shell eggs are eggs generally purchased by grocery stores in cartons for resale to the consuming

---

[1]     U.S. Int'l Trade Comm., Industry & Trade Egg Summary 1 (Dec. 1999).

public.  Shell eggs are also purchased by entities such as restaurants and hotels.[2]  The shell egg

sector produces breaking eggs for the "egg products" sector.

42.     Of the 211.1 million cases (estimated) of shell eggs produced in 2007: 66 million

cases (31.3%) were further processed (for foodservice, manufacturing, retail and export); 124.6

million cases (59%) went on to retail; 19 million cases (9%) went for foodservices use; and 1.5

million (.7%) were exported.

43.     The egg products sector produces eggs that have been removed from their shells

and processed for convenience into dried, frozen or liquid forms.  Processing eggs involves

breaking, filtering, mixing, stabilizing, blending, pasteurizing, cooling, freezing or drying, and

packaging.  The primary purchasers of egg products are the food manufacturing or foodservices

industries.

44.     In the commercial food manufacturing industry, egg products are often used as an

ingredient in baked goods or items such as mayonnaise, pasta, and salad dressings.  Foodservice

industry operators such as fast food chains, restaurants, hospitals and nursing homes use egg

products for convenience and ease of handling and because egg products are pasteurized and thus

ensure a high level of food safety.

45.     The production, processing, packaging and distribution of shell eggs and egg

products constitute and affect interstate trade and commerce.

46.     The value of all egg production in 2007 was $6.68 billion, up 51 percent from

$4.43 billion in 2006.[3]

---

[2]     *Id.*

[3]     *See* http://www.poultryegg.org/economic_data/

## 2.  Domestic Egg Production

47.     The egg industry is largely vertically integrated and egg producers have a tremendous amount of control over their products.  The egg industry is distinctly different from many other animal industries in that egg producers often own and manage nearly every aspect of their business (*e.g.*, rearing of birds, feeding, housing, husbandry, and marketing of their product) and meticulously oversee the entire process.[4]

48.     If it is not a fully integrated operation, some egg producers purchase their layer stock (*i.e.*, day old leghorn chicks) from an egg-type hatchery.  Hatcheries deliver chicks to the producer within one to two days of hatching.  At arrival, chicks are either placed in typical layer pens or reared in a pullet house.[5]

49.     Pullet is the term given to young female chickens that will become egg-laying hens when they are sexually mature.[6]

50.     Caged shell egg producers raise their pullets in cages for ease of production and to provide a barrier to separate them from their feces.  These pullets are reared on short days in light controlled houses usually on a program of 8 hours of light and 16 hours of darkness (8L:16D) until around 18 weeks of age to allow for adequate skeletal growth before the onset of egg laying.  These pullets are also fed limited amounts of feed to prevent them from accumulating excess body fat before egg production starts.[7]

51.     Daily light exposure begins to increase at Week 16 to at least 14 hours (14L:10D).  This increase in light exposure triggers hens to begin laying eggs which occurs about two weeks

---

[4]     Ryan A. Meunier and Dr. Mickey A. Latour, "Commercial Egg Production and Processing."
[5]     *Id.*
[6]     Commercial Pullets and Layers – Poultry Study Guide UC Davis.
[7]     *Id.*

after light stimulation.  In tandem with light manipulation, the diet is also altered in order to support egg production.[8]

52.     When a flock (group of layer hens) first enters egg production, the rate of egg lay is generally around 10 to 20 percent.  Thus, approximately 10 to 20 percent of the hens are laying eggs at 18 to 22 weeks of age.  The flock quickly reaches peak egg production (90 plus percent) around 30 to 32 weeks of age.  Post-peak egg production (after 30 to 32 weeks of age) continually decreases to approximately 50 percent around 60 to 70 weeks of age.[9]

53.     When the flock declines to around 50 percent production, producers may decide to molt the flock in order to achieve a higher level of egg production or to dispose of the birds.  Molting stops egg production while the chickens are growing new feathers.  A molt takes about 8 weeks to complete.[10]  In a competitive egg market, molting is generally dictated by current egg prices and the availability of replacement pullets.

54.     In wild birds, molting is a natural seasonal event in which birds substantially reduce their feed intake, cease egg production, and replace their plumage.  Induced molting for layer hens is a process that attempts to simulate natural molting events.  To induce molting, producers may reduce light simulation (artificial day length) and impose dietary feed restrictions (including limiting food and water or providing diets of low nutrient density) that result in cessation of egg production.

55.     After a molt, the flock will again increase egg production.  Post-molt egg production will increase such that peak egg production in the flock reaches about 80 percent.  Peak production following a molt is short-lived and the flock generally returns to 50 percent production by 100 to 110 weeks of age.  Once flock egg production falls below fifty percent, an

---

[8]     *Id.; see also* n.3 *supra.*
[9]     n.3 *supra.*
[10]    *Id.*

14

economic decision is made whether to molt the birds for a second time or to "depopulate" the building.

56.     "Spent hen" is the term given to egg-laying hens who are no longer able to perform at the desired level of production.  Two primary methods are used to depopulate and dispose of spent hens.  Hens are either killed on site or transported to a processing facility where they are processed into low-quality meat by-products or livestock feed.

57.     The majority of hens are between 100 and 130 weeks of age when they reach the end of their egg production cycle.  Hens may be molted a second time and then disposed of (approximately 120 to 130 weeks of age) or disposed of following peak production after the first molt (approximately 100 to 110 weeks of age).[11]

58.     Eggs are collected on nylon belts and sent to a storage cooler or egg processing center.  Eggs generally arrive at the egg processing center within 12 to 14 hours post-lay where they are washed, inspected (checked for eggshell problems, cracks, and blood spots), and then graded for packaging.  Following packaging, eggs are moved to a cooler room where they await shipment to retail outlets.  Egg producers commonly deliver eggs to purchasers within one week of lay.[12]

59.     The vast majority of eggs are produced from chickens that are raised their entire lives in cages with non-organic feed.

60.     USDA Organic eggs are produced by hens fed a 100 percent organic diet, containing no hormones or animal by-products.  Organic hens must have some access to the outdoors.

---

[11]     *Id.*
[12]     *Id.*

61.     Approximately 5 percent of the country's egg-laying hens are allowed to roam "cage free" rather than being placed in cages. "Free-range" hens also have access to the outdoors.

62.     Organic, free-range, and cage-free eggs are referred to as "specialty eggs" and are not the subject of this lawsuit.

### 3.     Egg Supply Determines Prices and Profits

63.     The chicken egg industry has been subject to price fluctuations. Further, the size of the nation's laying flock has also varied in the past few decades, with a noticeable effect on price. Although the national laying flock steadily decreased from 317 million in 1967 to 290 million in 1983 and to 258 million in 1998, the production level increased over the years from 170.5 billion cases in 1984 to an estimated 192.5 billion in 1999. In 1993, large eggs sold for 76 cents per dozen, but in 1996, prices increased dramatically to a record average high around 90 cents per dozen. By 1998, the price was back down to 78 cents.

64.     In the mid to late 1990s, egg farmers attempted to influence future pricing by slowing the rate of increase of the hatching egg flock, thus reducing production. The flock grew by only a fraction of a percent in 1995 and only 1 percent in 1996, compared with a 6 percent growth rate in 1991. Therefore, prices rose in late 1995 and remained strong throughout 1996.[13]

65.     Although annual per capita egg consumption fell substantially throughout the 1980s and early 1990s (from 275 in 1980 to 225 in 1992), it rose to 245 eggs in 1998. By 2005, annual U.S. per capita egg consumption had reached about 255 eggs. The United States produced almost 77 billion table eggs in 2005.

66.     The large majority of the U.S. table-egg production is consumed domestically.

---

[13]     "Chicken Eggs – Industry and Marketing Report," Goliath (updated Mar. 27, 2008).

67.     Egg products consumption has also continued to increase.  For example, 76.5 million cases of eggs were used in the manufacture of liquid, frozen, or dried egg products in 2004, compared to 53 million cases in 1997.[14]

68.     The egg industry is dominated by a few major players.  In recent years, the tendency toward huge egg factories has become even more pronounced.  By the mid-2000s, 64 egg-producing companies had more than 1 million layers; 11 of those had more than 5 million layers.  Today, the largest egg producer, marketer in the country, defendant Cal-Maine Foods, has over 26 million layers.

69.     In the past twenty years, the egg industry has become increasingly consolidated. In 1987 there were approximately 2,500 egg producing operations; today there are fewer than 250 producers who own 95 percent of the U.S. laying flock.  Approximately 60 companies own 80 percent of the U.S. egg laying flock.

70.     The single greatest influence on egg price is supply.[15]  Even very small reductions in production can cause egg prices to rise sharply.  For example, in early 2007, USEM initiated an export order for 300 container loads of eggs (approximately 246,000 cases) of eggs (less than one-third of eggs produced daily in the U.S.) in order to drive up the domestic price for eggs by $0.31/doz. This order "changed the complexion of the market in a matter of days.  When producers started to fill the order ... shell egg producers realized a $44,000,000 pay hike."[16]

---

[14]     *Id.*

[15]     Dr. David Roland, "Supply Management: The Key to Profits," Egg Industry (June 2007).

[16]     John Todd, "What 2007 Has in Store: No Shortage of Challenges and Opportunities," Egg Industry, (Jan. 2007) at 1. *See also* "Happy & Profitable New Year: USEM Export, United Voices" (United Egg Producers, Alpharetta, GA), Jan. 4, 2007, at 1 ("[t]he United States Egg Marketer (USEM) members have once again voted overwhelmingly to accept a sizable export ... [to] be delivered between January 8th and February 2nd. USEM now has the membership support from producers owning approximately 139 million layers. . . . With the delivery of such large volume export, it is expected that prices will exceed UEP's forecast.  It is also believed that

71.     As described below, UEP and its co-conspirators have used this price sensitivity to export eggs at a loss in order to increase the price of eggs in the future.  Furthermore, these sensitivities have allowed UEP and its co-conspirators to artificially raise and fix prices for eggs through even small reductions in egg supply.

72.     Demand for eggs is relatively inelastic – that is, consumers do not purchase fewer eggs when prices rise.  UEP member and first vice chairman, Bob Krouse (president of defendant Midwest Poultry Services), summarizes inelastic demand in the egg market saying: "[w]e sell as many eggs at $1.70 as we do at 65 cents."[17]

73.     According to Bill Rehm, UEP member of president of defendant Daybreak Foods, substantially high egg prices do not hurt consumer demand. Rehm told Egg Industry magazine, "I tend to think that consumers will buy eggs whether the price per dozen is 70 cents or $1.70."[18]

74.     An interview with American Egg Board CEO, Joanne Ivy, confirmed this price inelasticity:

> "Q: How did egg sales fare in 2007 with prices setting all-time record highs? In other words, are egg sales vulnerable to price changes?
>
> A: According to Nielsen data, average retail prices for 12-count large eggs in supermarket channels increased over 20 percent from 2006 to 2007, yet most retailers continued to experience heavy demand well after the holidays.  In fact, retail demand during the month of January was unusually high and many producers were reporting that their sales were much higher than originally forecasted.  Clearly, consumers recognize that even with these higher retail prices, eggs remain a great value, and that the

---

the announcement of USEM working on a sizable export may have helped hold prices at higher levels the last week of December.").

[17]     Edward Clark, "Despite High Feed Costs, Egg Executives Look for Profitable 2008," Egg Industry (Feb. 2008).

[18]     "Egg Executives Optimistic in 2007," Egg Industry (February 2007)

> **demand for eggs is inelastic; that is, the quantity demanded does not change when the price changes.**"[19]

75.    Inelasticity of demand is due in large part to the fact that there are no substitutes for eggs.[20]

76.    Eggs are a unique product with specific characteristics including flavor, texture, and baking attributes which are unmatched by other products.  These characteristics differentiate eggs from potential substitutes.  Because of these unique qualities and characteristics, if the price of eggs is increased, purchasers cannot switch to other products to make the price increase unprofitable.  In the absence of substitutes, purchasers have little choice but to pay the asking price.

77.    An excess of supply in the face of a relatively inelastic demand for eggs causes egg prices to drop.  As reported by Egg Industry magazine in an article titled "Supply Management: the Key to Profits" Dr. David Roland stated, "[i]t is estimated that hundreds of millions of dollars have been lost and will continue to be lost unless better methods of supply management become available."

78.    As Dr. Roland noted, in an effort to restrain output, "the United Egg Producers has promoted reducing hen numbers by emptying houses early, delaying refilling, and reducing cage density."[21]

79.    As a direct result of the reduction in output of eggs, egg prices have jumped dramatically.

---

[19]    Egg Industry (April 2008) (bold emphases added throughout Complaint)
[20]    According to the American Egg Board, there are no substitutes for eggs: "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single egg alternative." http://www.aeb.org/EggProducts/pdfs/ Functionality_white_paper.pdf ("American Egg Board, Accept No Substitutes: Research Shows No Single Substitute Matches the Functionality of Egg Product").
[21]    Dr. David Roland, "Supply Management: the Key to Profits," Egg Industry (June 2007) ("[T]he single greatest influence on egg price and profits is egg supply[.]")

80.     Egg prices were at historic highs throughout 2007 and 2008.  According to the *Wall Street Journal*'s MarketWatch, egg prices increased 45 percent between August 2007 and March 2008.[22]

81.     On February 1, 2008 an industry trade magazine likened the economic prosperity currently enjoyed by egg producers to Greece's Golden Age: "It seems that the egg industry may find itself in a position of economic prosperity previously unmatched in its long, tumultuous history. [ ] Egg prices have soared at historic highs through months in which producers usually hold on for dear life."[23]

82.     In March of 2008, USDA economist David Harvey told MarketWatch that egg prices typically decline at the end of March after the Easter holiday, but had not this year: "Normally, we see a decline in prices after the Easter holiday. But with the number of birds in the laying flock continuing to be down, we may not see much of a drop."

83.     UEP's senior vice president, Chad Gregory, acknowledged that prices were high as a result of UEP's conspiracy to reduce output: "Producers are being really responsible, keeping supply in check[.]  So this could last a while."[24]

84.     According to a March 2008 USDA Market Outlook Report, "egg prices [have] skyrocket[ed]."[25]

---

[22]     Matt Andrejczak, "High-flying egg prices show no Egg Prices Show No Sign of cracking,"Cracking, MarketWatch, Mar. 28, 2008 ("If you haven't shopped for eggs lately, get ready for some sticker-shock: A dozen eggs cost $2 or more in most U.S. cities, up about 45% in just eight months.") (only quoted material included).

[23]     Sam Krouse and Bob Krouse, "Infrastructure's Role in Keeping Egg Prices High," Egg Industry (Feb. 2008) (Bob Krouse is the current UEP first vice chairman and a member of the UEP board of directors). In October 2007, the publication reported that 2007 egg prices were "one for the record books." Edward Clark, 2007 Egg Prices: One for the Record Books - Has the Industry Finally Learned How Not to Overproduce?, Egg Industry, (Oct. 2007),

[24]     *Id.* (only quoted material included).

[25]     Mildred M. Haley, "Egg Prices Skyrocket," Livestock, Dairy, and Poultry Outlook (ERS/USDA), Mar. 2008,

85.     On March 30, 2008, the *Chicago Tribune* reported that prices are climbing at rates faster than they've been in 30 years: "[e]gg eaters are feeling the pain of soaring chicken feed prices, which egg producers are successfully passing down to the grocery aisle.  What's more, the egg industry's normal response to good times, which is to feverishly add capacity until prices drop like a rock, hasn't materialized.  That could keep supplies tight and prices high well into 2009."[26]

86.     On May 1, 2008, U.S. Department of Agriculture Chief Economist Joseph Glauber testified before Congress and indicated that high feed prices were not to blame for reduced egg production: "[i]n 2007, table-egg producers cut production.  The decision to reduce production likely took place prior to the recent run-up in feed costs.  In 2007, the wholesale price for a dozen grade A large eggs in the New York market averaged $1.14 per dozen, 43 cents higher than the previous year.  The strong increase in egg prices reflected lower production and strong domestic demand. ... Given the current size of the table-egg flock and the number of birds available to add to the flock, no significant expansion in production is expected before the second-half of 2008.  Wholesale table-egg prices (New York area) averaged $1.59 per dozen in the first-quarter, up 51 percent from the previous year." [27]

87.     In May of 2008, USDA Secretary Ed Schaffer announced: "egg prices [ ] were extremely high last year and still are seeing some increase in prices this year."[28]

---

[26]     Mike Hughlett, "Why Egg Prices are Cracking Budgets," Chi. Trib., Mar. 23, 2008, at 1.
[27]     Statement of Joseph Glauber, Chief Economist, Before the Joint Economic Committee, U.S. Congress (May 1, 2008).
[28]     Transcript of USDA Officials Briefing with Reporters on the Case for Food and Fuel (May 19, 2008) (No. 0130.08) ("There you can see some of the major components that have contributed to this increase. Certainly because of the high wheat prices that we've seen globally, cereal and bakery products are up considerably; fats and oils, vegetable oils have been very high; and also egg prices which were extremely high last year and still are seeing some increase in prices this year.")

88.     In July of 2008, reports noted that after falling from March's record highs, egg

prices shot up again 27 percent since mid-May again due to tightened supplies.[29]

89.     While many egg producers have pretextually blamed high egg prices on rising

feed costs, Fred Adams, founder and chairman of defendant Cal-Maine Foods, candidly

acknowledged this was not the case and that tight supplies were the reason for high prices:

> **"While it makes it easier to communicate that when feed costs
> are up egg prices should be up – that's really not the case.
> Eggs are up because the supply and demand is in good balance
> and it's reflecting higher prices on its own.** If the supply of eggs
> remains in check, or favorable to the demand side, I think we will
> have minimum problems in raising prices.  We have had no
> reaction from the consumer or the chain store operators as to
> price."[30]

90.     Egg producers are reaping unprecedented profits as a result of this conspiracy to

fix prices and reduce output.  For example, Cal-Maine Foods has seen its quarterly profits more

than triple thanks to record high egg prices.[31]

91.     On May 9, 2008, defendant Michael Foods, the third largest egg producer in the

U.S., reported that its first quarter net earnings for 2008 were $11.3 million, up from $4 million

from last year's quarter.[32]

92.     In July 2008 defendant Golden Oval Eggs reported a net income of $2.8 million

in the third fiscal quarter ended May 31 compared to a loss of $1 million the previous year."[33]

Golden Oval's net income was up despite a 41.4 decrease in pounds sold from the previous year.

The decline in pounds sold was partially " a result of reductions in flock sizes associated with an

---

[29]     Jim Downing,"Wholesale egg prices take surprising Egg Prices Take Surprising Jump,"
Sacramento Bee, July 2, 2008.
[30]     Audio Recording: Presentation by Fred Adams for Cal-Maine Foods, Inc. Stephens
Spring Investment Conference (June 4, 2008).
[31]     Cal-Maine Foods, Quarterly Report (Form 10-Q) (March 1, 2008).
[32]     Press Release, Michael Foods Reports First Quarter Results (May 9, 2008).
[33]     "Golden Oval Eggs shows profit of $2.8 million for quarter," Egg Industry (July 2008).

increase in the amount of space allotted to each bird in compliance with animal care guidelines[.]"

93.     In June 2008 defendant Moark reported sharp increases in its 2008 first quarter earnings: "Pretax earnings in the quarter for the shell eggs division were $32.3 million, compared to $4.2 million in earnings for the same quarter in 2007, the company reports. Sales for the quarter were $181 million compared to, up $61 million from the first quarter of 2007."[34]

94.     Mark Oldenkamp, vice president, northwest operations for defendant Valley Fresh Foods, told *Egg Industry* that high eggs prices were due to producers' efforts to control supply saying, "The industry is learning not to overproduce."[35]

**B.     UEP, its Members, and Non-Members Have Conspired to Fix Prices and Reduce Output**

        **1.     UEP's Formation**

95.     UEP is the largest egg trade organization in the United States.[36]

96.     According to its October 2007 newsletter, "[i]t was announced during UEP's Annual Membership Meeting that the organization's membership was at the highest level ever with 198 members representing 270 million hens or 96% of the nation's total hens."

97.     In 1967 and 1968, overproduction created a glut of eggs in the market and for eighteen months producers sold eggs at any price they could get – often below cost. UEP was formed in 1968 after a group of egg producers got together to discuss the "disastrous price cycles of the egg industry."[37]

---

[34]     "Land O' Lakes Bottom Line Shows Sharp Spike Upwards," Egg Industry (June 2008)
[35]     "2007 Egg prices: One for the Record Books," Egg Industry
[36]     United Egg Producers, About United Egg, History & Background, http://www.unitedegg.org/about _history.aspx
[37]     *Id.*

98.     The producers formed UEP to provide services to the egg industry, namely, "price discovery, production and marketing information, unified industry leadership, [ ] a strong relationship with USDA, [ ] a Washington presence, [and] strong industry promotion efforts."[38]

99.     Initially formed by five regional co-ops, in 1998 UEP amended its charter to become a group composed of individual members farms and producers.

100.    Membership in the UEP is open to non-egg producers, as well.  UEP's web site states that membership is open to "owners of breeder flocks, hatcheries, and started pullets, as well as contract egg producers . . . ."

101.    As such, some members if UEP are not egg producers at all.  For example, M&C Anderson Pullets, a UEP board member, raises pullets for egg farms and does not produce or sell eggs.

102.    UEP produces the bi-weekly "United Voices" newsletter for its members.

103.    According to its website, "UEP is an alliance of five separate organizations providing services to the egg industry."[39] The organizations are:

(a)     United Egg Producers;

(b)     United Egg Association Further Processor Division;[40]

(c)     United Egg Association Allied Industry Division;[41]

---

[38]    *Id*. UEP's original regional cooperative members were (1) National Egg Company; (2) Northeast Egg Marketing Association; (3) Midwest Egg Producers; (4) Northwest Egg Producers; (5) Southwest Egg Producers; and (6) Western Egg Company.

[39]    United Egg Producers, About United Egg, http://www.unitedegg.org/about_ue.aspx

[40]    United Egg Producers, About United Egg: Further Processors, http://www.unitedegg.org/about_processors.aspx ("UEA Further Processors was established in 1983 as a Trade Association to represent those companies engaged in breaking & further egg processing into egg products. [ ] Customers include bakeries, food service establishments and food manufacturers. [ ] 44 UEA Further Processor Members Represent Over 95% of all Shell Eggs Broken in the U.S.")

[41]    United Egg Producers, About United Egg: UEA Allied, http://www.unitedegg.org/about_allied.aspx ("UEA Allied was organized in January 1995 as a

(d)      United Egg Association Producer and Packer Division;[42] and

(e)      United States Egg Marketers.[43]

104.    "Management for this alliance is provided by United Egg Producers."[44] UEP

manages the "alliance" which includes cage manufacturers, vaccine companies, poultry

geneticists, manure conveyor belt manufacturers and others under the "umbrella" of the United

Egg Association.[45]

105.    These organizations which make up UEP are not egg producers.

106.    The United Egg Association ("UEA") is a nonprofit IRS 501(c)(6) organization

existing under the laws of Georgia created by UEP to "serve those of the egg industry not

qualified for United Egg Producers membership" and thus those who are explicitly not entitled to

Capper-Volstead protections.[46] The UEA has three divisions: (i) Further Processors (egg

breaking and further processing), (ii) Producers and Packers, and (iii) Allied Industries (products,

services, and consulting). According to its IRS Form 990, UEA's "primary exempt purpose" is to

"promote, educate [and] defend issues for [the] egg industry" and lists its "exempt purpose

achievements" as follows:

---

trade association representing companies or individuals which are engaged in providing
products, services, consulting and/or information services to the egg industry but do not produce
eggs or engage in the processing of eggs into egg products. Staff Coordinator: Gene Gregory")
[42]      United Egg Producers, About United Egg: Producers & Packers,
http://www.unitedegg.org/about_prodpack.aspx ("The UEA Producers/Packers organization was
organized in September 1995 as a trade association to represent companies or individuals who
pack (and/or produce) eggs but do not qualify for membership in a Capper-Volstead
Cooperative. Staff Coordinator: Chad Gregory").
[43]      United Egg Producers, About United Egg: US Egg Marketers,
http://www.unitedegg.org/about_marketer.aspx ("A producer cooperative established
specifically for the purpose of exporting large quantities of U.S. Shell Eggs.")
[44]      United Egg Producers, About United Egg, http://www.unitedegg.org/about_ue.aspx
[45]      United Egg Producers, About United Egg: History & Background,
http://www.unitedegg.org/about_history.aspx ("United Egg is the umbrella or unified voice for
all egg industry related issues and topics.").
[46]      Id.

(a)     Further Processors – To enable concerns [and] competiteness [sic] of the further processor egg industry to be fairly represented. Client newsletters distributed, related issues updated, [and] information gathered.

(b)     Producer Packers – To enable egg producers that are packers to have a viable [and] competitive industry. Member newsletters distributed. Information and trends updated [and] issues addressed.

(c)     Allied – To enable members, customers [and] businesses associated with the egg industry to have a viable business. Industry newsletters distributed.[47]

107.     UEP's annual meetings are held in conjunction with the UEA's meetings.[48]

108.     One of the groups making up the UEP is the United States Egg Marketers, Inc. ("USEM"). USEM is a nonprofit corporation existing under the laws of the State of Georgia that negotiates egg export sales.[49]

109.     UEP, UEA and USEM all share the same address at 1720 Windward Concourse #230, Alpharetta, Georgia 30005.

110.     The top executives of the UEP, as well as the UEA and the USEM, are not egg producers.

---

[47]     United Egg Association, Tax Return, (Form 990), at 3 (2006).

[48]     John Todd, "On the Road: UEP Debates Supply Management at Annual Meeting," Egg Industry, (Jan. 2007) ("The United Egg Association, Allied (UEA) Annual Meeting was held in conjunction with the UEP meeting in San Antonio. UEA now has 61 member companies. Representatives from these companies also attended the UEP Committee and Board meetings. Officers for 2007 were elected as follows: Jim DeBleyker, Chairman, Big Dutchman Co.; Andy Long, Vice Chairman, Biomune Co.; Brad Brown, Secretary, Dolco Packaging; Mark Dutt, Treasurer, Pactiv; and Del Farrer, EggPac Chairman, Henning Construction.")

[49]     Statement of the United Egg Producers: Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong.(2007) (statement of Gene Gregory, President, United Egg Producers).

111.    Gene Gregory is the president and chief executive officer of UEP.  Gregory began his tenure with UEP in 1981 when he was appointed chairman of the animal welfare committee and began developing an industry code of good management practices and a producer certification program.[50]  Gregory became Member Services Director for the Midwest region the following year.  Gregory is also president of the UEA and the USEM and treasurer of the United Egg Association Political Action Committee.

112.    Gene Gregory's son, Chad Gregory, is senior vice president of UEP and the UEA.

113.    Neither Gene nor Chad Gregory are egg producers.

114.    UEP is governed by a board of three to fifty directors who are elected annually. Some, but not all, members of UEP's board of directors are affiliated with companies that produce eggs.  Some UEP member companies are merely processors or distributors and are not engaged in egg production as producers.

115.    There is substantial overlap in leadership personnel between UEP and the UEA. Gene Gregory is president of all three entities and has directed, participated in, and authorized UEP's unlawful conduct.  This participation includes Gregory's attendance at numerous meetings with UEP, UEA and USEM and other participants in the conspiracy.  Further, Gregory has written numerous articles in "United Voices" urging egg industry output restrictions.

116.    UEP and UEA share staff and UEA has provided financial support for many of UEP's projects, including those related to the output restriction scheme.

### 2.    UEP is not a Marketing Cooperative.

117.    UEP holds itself out as "federated Capper-Volstead Agriculture Cooperative" yet it does not engage in any of the functions enumerated under the Capper-Volstead Act.  UEP does not grow, harvest, ship, sell, bargain or compete for the sale of any agricultural products.

---

[50]    *Id.*

118.   UEP merely serves as an egg trade group and a forum for a price fixing agreement and a supply management scheme.  These activities fall outside the legitimate objectives of an agricultural marketing co-op.

119.   Many UEP members are vertically integrated from the point of production through final marketing.  These vertically integrated firms mill their own feed, hatch chicks, rear pullets, confine hens, produce and/or purchase eggs, wash, candle, grade, store, market, transport and distribute their own eggs.

120.   UEP members are competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their eggs.  UEP members do not associate to collectively process, handle and market their products and UEP does not provide those services.

121.   UEP does not wash, candle, grade, break, pasteurize, package, store, transport, or distribute its members' eggs.

122.   UEP does not negotiate contracts of sale for its members.

123.   UEP has previously declared that it did not sell eggs to consumers.[51]

124.   UEP does not "market" its members' products.  Rather, as set forth in their promotional materials, publications, web sites and numerous public statements, UEP was founded for the express purpose of providing "services to the industry" and created the United Egg "Alliance" to "provide service to and represent the interests of all sectors of the egg industry[.]"[52]

---

[51]      National Advertising Division of the Council of Better Business Bureaus Case Report, "In the Matter of United Egg Producers, Inc. Animal Care Certified Eggs," Case #4108 (Nov. 6, 2003) at 4.
[52]      United Egg Producers, Member Booklet, at 1, 7 (emphasis added) ("Concerned with the disastrous price cycles of the egg industry and with no unified voice to address industry issues, a group of producers met in the fall of 1968 to discuss the formation of an organization that could

125.    In implementing the output restriction scheme discussed herein, UEP has conspired with non-member co-conspirators who are not engaged in egg production. For example, UEP has conspired with UEA and USEM to implement its unlawful supply control campaign at industry meetings. UEP has also conspired with non-member cage manufacturers and other entities involved in egg production that are not agricultural producers.

126.    Cage manufacturer representatives and other non-member co-conspirators were often invited to UEP meetings where supply management issues were discussed to provide input and support for the UEP certified supply restriction scheme. Moreover, cage manufacturers held numerous leadership positions in the UEA.

127.    Not all of UEP's members are engaged in the production of eggs and UEP membership is open to non-egg producers. Some UEP members process other members' eggs or raise breeder flocks or started pullets.

128.    A number of UEP members market eggs produced under production contracts with growers who possess their own egg-production facilities. Thus, some of these members do not produce a majority of the eggs they market, but merely act as conduits for other producers' eggs.

129.    In February of 2007, UEP newsletter discussed the fact that the organization considered forming a "supply-managed cooperative" that might have some protection under the Capper-Volstead Act (an implicit, if not explicit acknowledgement, that the present incarnation of UEP did not have such protections). The newsletter stated:

> "Potato Cooperative: Speaking for the United Potato Growers,
> Wright and Wilson stated that potato growers have experienced

provide the needed industry leadership. Their vision was to establish an organization that could provide the following services to the industry.... In order to provide service to and represent the interests of all sectors of the egg industry, UEP created the United Egg Association and all its divisions.").

similar supply demand problems of those of egg producers with supply often exceeding demand. They stated that the entire industry was running out of control with excess farm production and excess processing capacity while also finding consumers purchasing fewer potatoes. Each year for a three-year period of 2002 – 2004 growers were producing 1.3 billion pounds of potatoes no consumer or processor wanted or needed. The entire industry completely ignored the facts and just kept doing business as usual with growers and shippers thinking that the "last man standing" was the only option. By March 2005 a national Capper Volstead cooperative had been formed and now represents 70% of all fresh potatoes grown in America. With costs to grow 100 pounds of potatoes in Idaho being approximately $6.00, Idaho farmers had seen revenues drop from $8.21 in 2001 to $2.52 in 2004. Under cooperative supply management, things began to turnaround and revenues reached $6.67 in 2005.

**"Despite recent extremely good egg prices, the egg industry has a history of being unable to control supply and thereby suffering though difficult periods of severe financial losses. <u>With this in mind, the idea of a supply-managed cooperative similar to the United Potato Growers was referred to UEP's Long Range Planning Committee for consideration</u>."**

### 3.    UEP's Supply Control Conspiracy

130.    UEP has been attempting to conspire with its members and other non-members to restrict egg supply and artificially fix prices since its inception. For example, one of its first strategies was to publish a booklet for agricultural lenders advising bankers not to lend money to egg producers seeking loans to increase their flocks unless the borrower could first prove that a market existed for the expanded production. According to an article titled "Please don't lend to us," in *Banking*, "The strong suggestion is that the bank or other lending institution shouldn't lend a producer money to increase his flock unless the borrower can prove that he has a market, or as the egg men call it a 'home' for his increased production. [ ] United Egg Producers hopes

that lenders will force borrowers to prove that they have a market for any larger supply before lending to create that larger supply."[53]

131.    The following year, in 1969, UEP urged a voluntary surplus removal program which was moderately successful.[54]  In 1970 UEP resorted to a mandatory diversion program dubbed the "Action Now Program" to remove surplus eggs from the market.[55]  The program called for producers to divert 5 percent of production into other channels, for example, the breaker market. The program was an effective stop gap measure, but the reprieve did not last long.  By late 1971 over-expansion and backward integration from processing to egg production threatened the relative stability of the market.

132.    In 1971, an emergency meeting was called and UEP assembled a "production intelligence committee" to monitor and report back on production practices within the industry.[56]  Mike Possiter, the chairman of the new production intelligence committee, stated, "'It is absolutely foolish and irresponsible to allow uncontrolled expansion to continue from coast to coast at a time when most egg producers are faced with economic bankruptcy.  This new committee plans to probe deep into who is behind this expansion and let everyone know the names of firms and individuals responsible[.]'"[57]

133.    UEP's goals of reducing output in the egg industry to artificially fix and raise prices, established at the group's inception, have continued to today.  While previous attempts to fix and raise prices through supply restrictions have been moderately successful, starting in 1999

---

[53]      Please Don't Lend to Us, Banking (1968).
[54]      "United Egg Producers Voluntary [sic] Diverted Carloads of Eggs," Lancaster Farming, Oct 25, 1969 ("While egg producers are jubilant over the success of the voluntary surplus removal program, most of them insist that the ultimate solution will come when each producer accepts his responsibility to follow planned placement practices. United Egg Producers is currently waging a vigorous information campaign along those lines...").
[55]      "UEP Announces 5% Diversion," Lancaster Farming, Nov 28, 1970, at 1.
[56]      "UEP to Study Egg Glut Causes," Lancaster Farming, Dec 4, 1971, at 23.
[57]      Id.

and continuing to the present, UEP and its co-conspirators have undertaken a massive effort to

restrict supply which has artificially fixed and raised egg prices to historic levels throughout

2000 to the present.

134.    In 1994, UEP's long-time poultry research economist, Don Bell, calculated that

less eggs meant more income for the egg industry and that the only way to control supply would

be through "industry cooperation" and the "influence of trade associations such as UEP":

> When the USDA's table egg layer count is compared to the price
> the farmer receives for market eggs we see that for each one
> million hen change, prices change in the opposite direction by
> about 1 cent per dozen.  When this is plotted against industry
> income, a one million increase in the flock size is also associated
> with a decrease in industry income of $41 million.  **More hens,
> less income!**
>
> ...
>
> **The U.S. has no way to control its flock size other than through
> the persuasive influence of trade associations such as UEP.
> On-going efforts to warn the industry of impending over-
> production and industry cooperation to correct the problem
> before it becomes one means "money in the bank" for the
> entire industry.  Remember - in the egg industry, "more means
> less" - it always has and it will always be so.**[58]

135.    In 1999, after becoming an individual producer membership group, UEP decided

to take immediate action regarding egg supply and act as the conduit for an industry-wide supply

control agreement.  According to the UEP's "United Voices" newsletter, the meeting occurred as

follows:

> The Marketing Committee chaired by Dolph Baker, Cal-Maine
> Foods discussed and approved two extremely important issues.
> The current situation in the egg industry regarding price, as
> described by Chairman Baker, is in a crisis condition and the
> industry is hemorrhaging because of the low price.
> It was pointed out by both Chairman Baker and Ken Looper, who
> provided statistics for the meeting, that the industry is in a
> defensive mode regarding the price situation. **It was suggested
> that action be taken immediately to go on the offense regarding**

---

[58]    "An Egg Economics Update – When More Means Less!," Number 145, April 15, 1994.

**this particular situation.** Ken Looper provided numerous statistics showing the trends over the years regarding price vs. bird population.

**At the present time there are in excess of 7 million hens over what the economic limit should be.**

**It was decided that a bold move should be made to immediately reduce the number of hens that are currently producing eggs.** After considerable discussion, a motion was made and passed addressing the challenge in three phases:

• **Immediate molt of 5% of the flock.**
• **Cut back 5% on flock inventory over the next 6-12 months.**
• **Develop a hatch reduction program.**

There was an ensuing discussion regarding the publicity to the industry that this needs to be done.

There were 113 million birds represented at the meeting, leaving a majority that were not represented and through various means, including media, **this word will be brought to the total egg industry.**

Additionally UEP was encouraged to become more active in pushing the industry to accept responsibility of expansion and its educating the industry as to the ramifications of over-production. This relates to the increased production and building of new facilities that is now taking place.[59]

136.    UEP's benchmark was that its members could increased production by 2-3 million hens per year and maintain good returns, but by late 1999/early 2000, the industry was on track to add 10 million birds to the flock.  It was at this time that UEP recommended its short-term flock reduction strategy – and producers responded, culling and molting early and delaying or reducing replacements.  According to an industry article about the plan, the response "worked" and "the year-end flock was just 3.7 million hens larger than the year before and producers experienced a good holiday run and profitable year."[60]

137.    In accord with UEP, USEM's members also voted to reduce flocks:

In an attempt to address the over supply of eggs and lessen the impact of the current below-cost-of-production prices, the membership of United States Egg Marketers, Inc., has voted

---

[59]    "Overproduction is the Focus of UEP Meeting," Egg Industry (Nov. 1999), at 1-3.
[60]    "Egg producers looking at marketplace's options as industry again struggles with excess production," Feedstuffs (Nov. 5, 2001).

unanimously for a plan aimed at reducing the supply of eggs within the membership. The members of the cooperative, representing about 60 million layers or 23% of the nation's total egg production, adopted the following resolution: That each member immediately molt 5% of their total flock and achieve this goal no later than October 15, 1999; and each member reduce their total flock by 6% as quickly as possible, but no later than November 20, 1999 and maintain their flocks at the reduced levels through July 1, 2000; and that the chairman of the cooperative appoint a committee to study and develop a chick hatch reduction program for consideration by the membership no later than November 3, 1999.[61]

138.    However, a similar flock supply issue occurred in 2001. The UEP estimated that 10.8 millions hens would be added to the national flock by the end of the year. Thus, UEP developed another "emergency flock reduction" of 5%. UEP's emergency plan asked producers to begin running 100,000-hen houses at 95% capacity by de-stocking one bird per cage until houses reached the 95% capacity goal. Industry studies showed that these reductions would produce greater returns. Many producers signed "commitment sheets" to the program and others agreed to it in secret not wanting to publicly associate with the program.[62]

139.    Ken Looper, vice chair of defendant Cal-Maine Foods, prepared a table for the UEP and co-conspirators documenting the impact on price to changes in flock size, which was re-printed in an industry publication:

| Impact on price - high demand - | Change in flock size from year before | Impact on price - low demand - |
|---|---|---|
| + 23 cents | - 5,000,000 hens | + 16 cents |
| + 17 cents | - 4,000,000 hens | + 11 cents |
| + 12 cents | - 3,000,000 hens | + 7 cents |

---

[61]    "U.S. Egg Marketers Vote to Reduce Supply," Egg Industry (Nov. 1999).
[62]    "Egg producers looking at marketplace's options as industry again struggles with excess production," Feedstuffs (Nov. 5, 2001).

| + 8 cents | - 2,000,000 hens | + 4 cents |
|-----------|------------------|-----------|
| + 5 cents | - 1,000,000 hens | + 2 cents |
| + 3 cents | + 1,000,000 hens | 0 |
| + 1 cent | + 2,000,000 hens | 0 |
| 0 | + 3,000,000 hens | - 1 cent |
| - 1 cent | + 4,000,000 hens | - 3 cents |
| - 2 cents | + 5,000,000 hens | - 5 cents |
| - 4 cents | + 6,000,000 hens | - 8 cents |
| - 6 cents | + 7,000,000 hens | - 11 cents |
| - 9 cents | + 8,000,000 hens | - 15 cents |
| - 12 cents | + 9,000,000 hens | - 19 cents |
| - 15 cents | + 10,000,000 hens | - 23 cents |

Source: Ken Looper, Cal-Maine Foods, Jackson, Miss.[63]

140.    The egg industry realized it needed a more reliable way to implement and enforce its conspiracy to reduce output to artificially sustain prices.  As a result, it decided to use "animal husbandry" as a pretext to reduce the flock and egg supply.

141.    In 2000, UEP members had purported to adopt voluntary "animal husbandry guidelines" based on recommendations from a committee appointed by UEP's board of directors and a producer animal welfare committee.[64]  The 2000 guidelines were actually revisions to

---

[63]      *Id.*

[64]      Donald Bell, "Don Bell's Table Egg Layer Flock Projections and Economic Commentary" – 2002, No. 16 (July 16, 2002) ("This report was written by Don Bell, University of California Poultry Specialist emeritus, under the sponsorship of  United Egg Producers[.] ... United Egg Producer's has developed a set of cage space standards with the help of a scientific advisory committee and a producer animal welfare committee. The standards describe the step-wise introduction of increased space allowances, along with deadlines for the industry's adoption

UEP's performance-based guidelines adopted in the early 1980s.[65]  A key part of the 2000

guidelines was the recommendation that producers gradually increase cage space by transitioning

from 48 square inch per hen to 67-86 square inch per hen according to a twelve-year phase-in

schedule.[66]

142.    As part of these guidelines and UEP's and USEM's 1999 commitments to reduce

the number of hens that were producing eggs, UEP later convinced producers to not add capacity

or make up for the lost hens that would result through reduced cage densities in order to restrict

output and fix and raise prices.  This agreement to curtail production had no basis in animal

husbandry and was designed *solely* to reduce output and fix prices.

143.    In 2001, UEP members reaffirmed their "commitment" to the "scientific" cage

program.  In addition, UEP members agreed to quicken the cage space phase-in period from

twelve years to six.[67]

144.    UEP not only intended for the cage program to be a way for the industry to

conspire to reduce output, but it actually asked its economist to study this issue.

---

of the standards due to the extreme economic impact of such changes. [ ] The animal husbandry
recommendations of the two committees are relative to minimum space allowances in cages.").
[65]      "Egg Producers Adopt Animal Welfare Guidelines," Feedstuffs, Oct. 16, 2000.  In 1981,
UEP's current president, Gene Gregory, was appointed committee chairman of the newly formed
animal welfare committee. The "all-industry task force" set out to "develop an industry code of
good management practice...; develop industry situation brochure...; establish industry
clearinghouse for animal welfare information; seek academic advisor to committee; develop
producer certification program; develop egg industry press kit; establish communication
network." UEP Designates Director of Welfare, Lancaster Farming, May 2, 1981.
[66]      "Egg Producers Adopt Animal Welfare Guidelines," Feedstuffs, Oct. 16, 2000.
[67]      "Egg Producers to Quicken Phase-In: Hen Husbandry Standards," Feedstuffs, Dec. 12,
2001 (stating, "Egg producers also passed the motion after being urged by German egg producer
Jurgen Fuchs not 'to make the same mistake' German producers made when they dismissed the
animal welfare issue because they now are forced to abide by government-imposed standards
that will ban all battery cage housing in 2007. The German industry 'did not respond quickly
enough. That was a big mistake,' he said.").

145.    In July of 2002, Don Bell, under the sponsorship of UEP, drafted a report entitled "Several Possible Scenarios Resulting From UEP's New Husbandry Guidelines." The report noted that as of 2002, 70% of the nation's laying flock had been committed to UEP's scheme, but also found that "[i]ncreases in hen counts by back-filling cages at 'push-out' time or by utilizing previously un-used farms or houses my occur . . . As egg shortages increase, individual companies will find it necessary to replace the missing hens which will require new construction."[68]

146.    Nevertheless, Don Bell ultimately concluded that if the UEP and its co-conspirators were able to keep production down by not replacing lost hens, the maximum industry income could be between $3.55 billion (100% compliance with no growth) and $2.51 billion (50% compliance with 10% growth).

147.    In an article about his research, Mr. Bell said "the data are available for everyone to consider" and "we don't expect everyone to believe (these numbers), but the general directions in the numbers should be of interest to everyone involved in table egg production."[69]

148.    UEP and its co-conspirators set out to implement Don Bell's projections. While UEP's guidelines were being followed by a significant percentage of the industry, the industry was also making up for lost production through other means. As such, UEP realized that it needed to get its members to agree not to make up for the hens lost as a result of increased cage space. This was the key part of the output restriction conspiracy, unconnected to any perceived animal husbandry benefits that might result from larger cages.

---

[68]    "Don Bell's Table Egg Layer Flock Projections and Economic Commentary – 2002; Several Possible Scenarios Resulting From UEP's New Husbandry Guidelines," No. 16, July 16, 2002.

[69]    "Impact of hen husbandry on prices would be positive even in worst-case scenario," Feedstuffs (Aug. 5, 2002).

149.   As a reflection of the need for the industry to reach an additional agreement not to make up for lost hens, industry meetings expressed frustration with the "lack of compliance" on reducing output.

150.   During a "Marketing Committee Meeting" in October 2002, at the UEP annual meeting, then-chairman Dolph Baker, president of Cal-Maine Foods, called on California egg producer Arnie Riebli of NuCal Foods to speak to the crowd:

> Arnie, as only Arnie can, proceeded to speak forcefully for several producers about why the egg prices remain in their depressed status.  He indicated he and his fellow producers have never been more frustrated with the situation.  **There has been no compliance with bird number guidelines as outlined in previous meetings. UEP reports the overproduction problems regularly.  No one is living up to agreements previously made.... There are many older hens out there that 'should have gone to heaven.'**[70]

151.   Next, Ken Looper, vice chairman of Cal-Maine Foods, "presented the statistics on bird numbers and pricing. ... **The egg industry must reduce the flock or the price of the product will remain at depressed levels.**"[71] (emphasis added).

152.   Then vice-president of UEP, Gene Gregory, "indicated that he is frustrated by producers' calls asking what is being done to alleviate the situation.  Plans of action [to reduce hen populations] have not worked and Gene is at loss of what to say."[72]

153.   UEP's previous attempts to voluntarily control supply had not worked.[73]  The problems were related to compliance and a failure to prevent producers from making up for lost

---

[70]   John Todd, "Record Crowds and Heated Discussions at UEP," Egg Industry, Vol. 107, No. 11 (Nov. 2002) ("To add to the frustration, Greg Pearce, a Canadian producer, updated the committee on the Canadian situation.  *Controls of production assures a profitable product*.") (emphasis added).

[71]   *Id.*

[72]   *Id.*

[73]   "'Dreadful Year' Ahead for Eggs, United Egg Producers report," Feedstuffs (Nov 6 , 2006) ("Proposals at the UEP meeting for producers to voluntarily decrease chick hatches 3-5% over a 10-month period to better position demand and supply to strengthen prices failed at

capacity.  According to UEP's long-time poultry research economist, Don Bell, the trick was "to design the method and motivation" to convince producers to restrict output: "Major economic issues are involved [and compliance] will be difficult to accomplish by persuasion alone."[74]

154.    As such, UEP realized that the plan to reduce egg output would not work unless everybody played by the rules and producers could not be trusted to police themselves.  Thus, UEP began to implement monitoring and other procedures, such as surveys and production planning manuals, to ensure compliance with the output restriction agreement.  Further, UEP began a major effort, through its newsletters and non-public meetings, to convince producers to agree to implement the cage restrictions and then agree not replace the lost capacity or expand operations.  UEP also convinced retailers not purchase eggs unless they were "UEP certified" thus foreclosing markets to those who did not go along with the UEP's scheme.

155.    Egg prices declined until mid-October 2002 when the output restriction scheme began to see results.

156.    A May 1, 2003 UEP newsletter reported on the results and urged producers not to make up for lost production:

> The industry's 4-year period of depressed egg prices and financial losses began a recovery period in mid-Oct. 2002 that has carried forward through Easter of 2003.  There are possible many theories for this recovery, however we believe there are at least four major reasons. They are:
> **1. Reduced chick hatch.**

committee levels and in the board of directors meeting on the grounds that voluntary efforts don't work and penalize producers who are efficient and have markets to serve. [ ] However, [ ] strategies depend on voluntary efforts, which is why the chief executive officer of the United Potato Growers of America has been invited to UEP's meeting in January to talk about the group, which UEP could move to copy. United Potato was formed last year as a cooperative organized under the Capper-Volstead Act, a 1922 law that permits agricultural cooperatives to orchestrate supplies. In its first year, the organization "ordered," with member approval, hundreds of acres of potato production to be either not planted or buried, with a consequent 48.5% increase in producers' returns.").

[74]     "Cage Space Hardest of Hen Welfare Needs to Evaluate," Feedstuffs, Mar. 12, 2001.

**2. UEP's Animal Care Certification Program.**
3. Exotic Newcastle Disease.
4. Exports taken by United States Egg Marketers (USEM).
The reduced chick hatch began to take place in Oct. 2001 and has resulted in 16 of the past 18 months having smaller hatches than the comparable month a year earlier.  By the fact that producers held hens to older ages, the hatch reduction has yet to create a smaller layer flock. This however, will correct itself in the coming months and should provide a much smaller flock beginning in the second half of this year.  **The hatch reduction to meet UEP's Animal Husbandry Guidelines began April 2002 and will continue to provide a benefit until the industry begins building houses to replace lost production. Producers should however, wait until they have evaluated the extent of improved layer performances before determining the additional housing needed to replace lost production.**

157.    The article concluded: "**Now can we maintain a profitable industry? The decision is up to producers.**"

158.    In June 2003 UEP's newsletter noted: "**The hatch reduction, to meet the space allowance guidelines of the Animal Care Certified Program are beginning to show egg market value improvements.  This trend should continue.**"

159.    The same newsletter noted that UEP and its co-conspirators had "projected" that these supply restrictions, hidden under a pre-text of "Animal Care Certified" eggs, would work:

These market improvements can be attributed to:
1. **Reduced pullet hatch finally making an impact upon supplies**.
2. USEM exports reducing supplies at critical times.
3. **Animal Care Certified program beginning to work like <u>many had projected</u>**.

160.    In July 2003, UEP warned producers not to make up for lost hens in an article titled "Word of Caution":

As producers continue to reduce their layer house capacity to meet the UEP Animal Husbandry Guidelines, **please don't make the mistake of building new facilities to replace the lost number of birds.** First, estimate your improved production performance to

determine your overall egg production loss (egg numbers – instead of bird numbers), then build to replace only this loss.

161.    In September 2003 UEP urged producers - "Don't Screw Up A Good Thing":

**"One sure way of having poorer egg prices is by increasing egg supplies through holding hens longer and keeping hens that should be disposed.  Don't screw up a good thing!!"**

162.    The industry agreement to reduce output saw prices soar to record levels.  In November 2003, UEP's newsletter noted: "Egg Prices At Record Levels"

> Never in my more than 40 years in the egg industry have I ever seen egg prices at the current levels. We have used 1996 as the benchmark of when times were really good but never anticipated that prices could sustain producer prices above $1.00 per dozen for any extended period. Large prices for all regions east of the Rockies have now been above $1.00 since Sept. 25th and appeared headed for even higher levels.
> While supply has been reduced slightly, it appears that demand may be far greater than anyone can even calculate at this time. Consumers are still buying eggs and we have seen no resistance to price.
> As we enter the holiday season the demand will likely become more aggressive and prices will likely go even higher. **With the increasing demand, increasing population and the continued phase-in of cage space to meet the industry's animal welfare guidelines, prices are likely to continue at levels far above the past few years**.

163.    A November 2003 Feedstuffs article confirmed these results:

> 'It' represents 'a road that we've not traveled before,' according to Ken Looper, vice chair at Cal-Maine Foods Inc. in Jackson, Miss. 'And it's a road that I think we will travel a little while longer.'
> . . .
> 'It' is what has been a dramatic, exciting and possibly quite sustainable egg markets rally that began last fall and has hardly looked back, with egg prices heading into this fall's holiday season almost 22% higher than at the same time last year and nearly 80% higher than they were heading into October last year.
> The rally has turned four straight years of pricing weakness and overall losses into pricing strength **and profitability that's on track for a long run if producers do not overexpand in response to the prices and returns,** according to Feedstuffs

sources contacted during the annual conference of the United Egg
Producers (UEP) in Albuquerque.

The rally traces its roots to a classic demand and supply scenario in
which demand for eggs has increased substantially this year while
production of eggs has held steady.  Sources were divided over
whether demand has been more important than supply, although
**UEP senior vice president Gene Gregory argued that were it
not for the egg industry's move to adopt and implement its hen
husbandry standards, which call for deintensification,
producers may have continued to overproduce and oversupply
the market.**

164.    In December of 2003, UEP discussed the record prices and warned producers not

to get "too greedy" and produce more eggs:

Hopefully, everyone in or associated with the egg industry has
enjoyed the benefits of much improved egg prices during 2003.
After three or more years in which many of the industry
experienced financial hardships, relief finally began to take place
in late 2002.

Through the week ending Dec. 28, the Urner Barry Midwest Large
quote averaged 21 cents per dozen over the previous year. The
Central Breaking Stock quote averaged 21 cents per dozen and the
unpasteurized whole quote, average 17.8 cents per pound over
the previous year.

Using the Large quote, only as a comparison, we would estimate
that a producer with 100,000 layers would have realized a cash
flow improvement of more than $400,000.00 over the course of
one year's production.

**Now the true test will come as the industry attempts to
maximize returns while avoiding the temptation of being too
greedy and producing a supply greater than demand will
warrant at profitable prices. History tells us that the industry
doesn't have a good track record of producing for profits but
more for volume. Let's hope this trend doesn't continue.**
The average number of layers throughout 2003 will be about 276.4
million, virtually the same number as in 2002 and yet Urner
Barry's Large quote will average about 22 cents more per dozen. If
the U.S. people population grows by the estimated 3 million per
year, we will have had approximately 6 million more people in
2003 consuming eggs from virtually the same number of hens we
had in 2001. **Can the industry resist playing catch-up and
instead have managed growth?**

42

165.    Also in December of 2003, UEP urged producers not to "abandon the program"

and produce more eggs:

> The most important question on most egg producer's minds right now is; 'How long will this fantastic market last?' The current profit cycle started in Nov. 2002 and will most likely extend through Easter 2004.
> That would result in nearly 18 months of profits. Historically, 18 months is about the average length of time profit cycles have lasted in the last 30 years we have kept records.
> Will the current profit cycle be an exception? Actually, your guess is probably as good as mine. I could make a reasonable argument either way. The current reduced hatch and very strong demand would indicate good profits for all of 2004.
> I personally doubt that the egg industry could earn 20 to 30 cents per dozen for an entire year and not find a way to over produce. That would be about $6 per hen for the average producer and much more for companies that are top marketers.
> **I think the biggest challenge will be maintaining the UEP Animal Welfare Guidelines for increased space per bird. There will be a huge temptation to get greedy, and abandon the program by some of the companies.**

166.    In March of 2004 commentary, UEP noted the industry agreement to keep

production low resulted in industry revenue of more than $1,000,000,000:

> **The industry successfully held hen numbers down.** No increases in production were made to compensate for a larger human population. Demand was especially strong as evidence by the consumer's willingness to buy the same amount of product for significantly higher prices. Consumer prices of less than $1 per dozen may have become a thing of the past. Annual retail prices for 2003 were reported to be $1.25 per dozen for the year and $1.55 for Dec.. for the U.S. **Regardless of the causes, the industry would be wise to attempt to duplicate these conditions in the future. The result was: a huge improvement in industry revenue of ONE BILLION DOLLARS (or more)!!**

167.    Also in March of 2004, UEP also warned about increased hatching and urged the

industry not to expand:

> Now there are signs that bear watching. Cage manufacturers report brisk sales and the Jan. hatch was up (one) 1 million pullets over

43

Jan. 2003 and nearly equal to Jan. of 2002. **Can we resist the temptation to expand too quickly? UEP and USEM can only do so much to help the industry be profitable.** While both UEP and Don Bell have forecast extremely good prices for 2004, this can change quickly over the period of a year if producers don't watch for the warning signs."

168.   Gene Gregory, UEP's president, also urged producers not to expand production:

With prices far exceeding expectations, producers will naturally reinvest in their company. These investments will likely be remodeling existing facilities and building new facilities. Some of this is necessary to replace the lost hens from facilities meeting the Animal Care Certified program. Some is also necessary to meet the growing consumer demand. **Will egg producers expand too quickly and create a surplus beyond demand?** History tells us this will happen but the speed that would traditionally bring this about may be different this time.

169.   An April 8, 2004 newsletter asked "Can We Maintain Prices Above $1.00 Per Dozen?":

"Is it now time to rethink our position? Should we be disposing of those old hens and molting an increasing number of hens? Your association (UEP) can only do so much. **Egg producers must ultimately decide whether they want to produce to meet the egg demand or produce a surplus and sell at a loss.**"

170.   In May of 2004, Gregory urged members to stay "committed" to the program while referring to the "Animal Care Certified" eggs as a "roadmap" for the industry supply reduction campaign and increased profits:

**[T]he Animal Care Certified program is the only roadmap the industry has ever had for future planning. If you stay true to the program and manage it to meet the market demand, it can provide the industry with prolonged profits.** For many people, back filling to replace mortality was a new production practice and maybe necessary to maximize profits but it is now time to rethink this position. Back filling into unprofitable periods certainly doesn't make good business sense.
"The industry built an egg inventory prior to Easter expecting increasing demand. The inventory was far too large, demand was far less than expected, and we began panic selling to rid ourselves

of inventory. We caused the market to free-fall in all regions by as much as 60 cents or more.

"Are you satisfied with egg prices 10-15 cents below the cost of production? **Or are you committed to making a change? Are you committed to staying the course even when egg prices begin to show some strength? Whether you sell eggs in the shell or as egg products, if you are in the production business, you need to be committed to doing whatever is necessary to have prices above the cost of production.**

In regard to egg production, Chairman Deffner has this to say: '**We must remain disciplined in our approach to egg production. We must maintain responsible growth.  This can mean growth through acquisitions, remodeling of present housing, and in some cases through new facilities. We must remain disciplined in producing enough products to meet the increased demand without returning to the oversupply conditions of 1999-2002. There are a lot of old hens on the farms that need to be removed. Let's get back to our regular molt and kill intervals.'** We believe that the industry only needs to make a few minor adjustments but this needs to happen now. If we do this over the next few weeks then the future looks very bright for a very profitable industry during the second half of this year. **Are you committed or do you want to let someone else do the job and simply reap the benefits?**

The Marketing Committee has recommended that all UEP members molt flocks at 62 weeks and dispose of spent hens by 108 weeks and that this plan of action take place immediately and carry through until Aug. 1, 2004. **While this is a voluntary program, are you committed? Did you return your intention form to UEP? Those that are committed will be acknowledged in a future newsletter.**

171.    UEP identified the members that were "committed":

UEP asked the members of their intentions of following the recommended plan. The following companies have responded in the affirmative: Cal-Maine Foods, Country Charm Egg Distributors, English River Pellets, Featherland Egg Co., Fort Recovery Equity Co., Green Forest Egg Co., Hauge Egg Co., Hillandale Farms/Florida, ISE Newberry, Kokoff Egg Farm, Mahard Egg Farm, McAnally Enterprises, Moark Productions, Monty Produce, North Alabama Egg Col, Norco Ranch, Pilgrim's Pride, Randy Nelson Ventures, Southern N.E. Eggs, Tampa Farm Services, United Egg Marketing, Wilfie Farms, Zephyr Egg Co., Zoet Poultry.

Additionally the following companies reported they already have a company policy that nearly matches the recommended action. Most of these plans varied only one week from the recommendation: Bud Shepherd & Sons, Morning Fresh Farms, National Food Corp., Powl Associates, Ritewood, Inc., S&R Egg Farm, Schipper Poultry, Wabash Valley Produce, Wright County Egg Co.

The above named companies represent the ownership of approximately 83 million layers or only 29% of the nation's layer flock inventory.  Far greater participation is needed to have an impact. The following companies reported that they do not molt flocks and sell hens between the ages of 72-84 weeks of age: Berend Brothers, Eagle Creek Colony, Feather Crest Farms, Grand Mesa Eggs, P&R Farms, Phil's Fresh Eggs.

172.    In November of 2005, UEP acknowledged it was distributing a new "Production Planning Calendar" with a "real purpose" of helping to restrict supply:

> Very soon, UEP will have printed and distributed the 2006 Production Planning Calendar. While this annual calendar provides a great deal of statistical data, **its real purpose is to give producer/marketers a planning guide for the replacement of flocks or molting so that they may be able to maximize their annual returns**.

173.    In January of 2006, Gene Gregory discussed his "New Year's Resolution" which again urged members to reduce output:

> **At any rate, my resolution is to provide shell egg producers with sufficient statistical information that will confirm that it is a bad business decision to produce at 100% capacity during the months of May through Aug.**
>
> Don Bell, in writing about the economic trends of the California egg industry made the following comments: "Comparable annual data is available starting in 1966. During the next 40 years, the industry experienced a wide range of profits and losses with exactly 20 positive income and 20 negative income years. Annual profits range from a high of $2.39 per hen/year in 2003 to a low of minus $1.85 per hen/year in 2005. Profit or loss periods usually occur for 3-4 consecutive years with the interval between profit peaks or loss "valleys" of 5- 6 years in length. Positive years totaled $22.39 per hen while negative years totaled $15.41 per hen

during the 40 years studied – a net gain of $6.98 per hen or $.17 per hen/year – less than one cent per dozen."

Using Don Bell's analysis of historical patterns and the financial results we must as ourselves could we have changed this if we had paid more attention to the high and low demand months of each year? **If we had simply reduced our egg production during the months of May through Aug., could it have created a positive change that would have at least minimized the number of negative years?**

UEP has published a Production Planning Calendar each year since 1992. The purpose of this calendar is to provide data by which egg producers can make management decisions that will create the most positive financial results possible.  Even periods of low egg prices and financial losses can be minimized with a little planning. So why do we produce more eggs during a low demand period than during a higher demand period? Is it just tradition, or are not paying attention to supply/demand patterns?

When we look at a 10-year pattern, we find that Urner Barry's Midwest Large quote is at its lowest during the months of May through Aug.. **So I challenge you to look at your own records. Over the past 10 years have you made money in the months of May through Aug.? If not, then why not reduce your production during those months?** Are you afraid that you won't be as efficient? What is your goal – producing the maximum number of eggs or making money?

**So what can you do to change this pattern and improve the bottom line for the months of May through Aug. and ultimately improve your annual bottom line?** Well obviously I don't have the answers that will apply to everyone and every situation. My resolution is simply to give you some historical facts that will prompt you to look for ways that can change these patterns. **It may involve a review of your molting schedules or it may involve planning your flock schedules to have the least number of hens in peak production during the low demand periods.** Only you have the answers. The question is whether you will look for the answers and make the necessary changes to improve your bottom line.

**Now I have a request of each UEP shell egg producer member. Help me make my 2006 New Year's Resolution become a reality.**

174.    A February 2006 newsletter noted that "The Marketing/Price Discovery Committee reported on industry economics and **suggested that each producer member should review the monthly patterns of high and low egg demand and adjust supply to meet those**

47

**demands.** The first six-months of 2005? Are we headed for the same economic pattern in 2006?"

175.    After prices dropped in January and February, UEP proposed a 2 percent reduction in all members' hen populations in its February newsletter:

A concerned egg producer provided the following information and we felt it was worthwhile sharing and asking UEP members to consider.

### 2003:
2003 was a great egg price year. Midwest Urner Barry Large averaged 92.6 cents. We average 278.4 million layers for 2003 and produced 206.8 million cases of eggs.

### 2005:
2005 was a lousy egg price year. Midwest Urner Barry Large averaged 68.5 cents. We average 285.8 million laying hens and produced 213.9 million cases of eggs. Shell egg demand, at retail was down slightly in 2005 versus 2003 as a result of the passing fad of low-carb diets.

### Consider:
We had 7.4 million or 2.6% more hens in 2005 (the lousy year) than 2003 (the great year). The 2.6% more hens produced 3.4% more eggs in the lousy year than the great year. That increase in production was enough to cause a 24-cent per dozen decrease in prices, which equaled a loss of $1.5 billion in egg value.

### Question:
How to turn lousy to great – or at least, really good – in 2006?

### A 2% Solution:
**Every egg producer reduces their hen population by 2% no later than March 10, from their average hen number for 2005, and maintains that 2% reduction all year long in 2006. So simple, so painless, so rewarding – why wouldn't it work?**

176.    In April 2006, UEP issued a "Supply/Demand Alert":

Despite some weeks below the cost of production, shell egg producers enjoyed a profitable period for the first 15 weeks of 2006. **In anticipation that shell egg prices would fall considerably after the Easter market, UEP's Marketing Committee met via conference call on March 31st and developed a recommended plan of action. The Marketing Committee has made the following recommendations:**
**1. Dispose of flocks six (6) weeks earlier than previously scheduled.**

48

**2. Molt flocks six (6) weeks earlier than previously scheduled.**
To demonstrate how quickly the market can decline, we only have
to point to the fact that the Urner Barry price for Large eggs
dropped 15 cents per dozen in the first three days of this week (the
week of Easter). Have you considered that one day's production
from a million-bird complex at a 15-cent market value decline is
worth about $9,000.00 per day lost income? **Isn't a flock
adjustment (supply reduction) worth considering?**
Prior to the Marketing Committee's recommendations, a rather
large egg producer (ownership of approximately 14 million layers)
reported their company was implementing the following plan of
action: Effective the week of April 3rd, we began disposal of all
our flocks 4 weeks earlier than previously scheduled and initiated
molts 4 weeks earlier than previously scheduled.

177.    The UEP's suggestion appeared to work.  A May 2006 newsletter report noted:

The size of the nation's layer flock declined by little more than 3
million hens in April. This is good news!! The nation's flock size
was reported to be 288.7 million on May 1st, which was nearly 6.3
million larger than a year ago on the same date. This is bad news!!
Pullets hatched during April were down 9% from a year ago and
down 6% for the period Jan. through April. This is good long-term
news!!

178.    In June, however, flocks came back into production.  A June 2006 newsletter

asked: "Are Early Molted Flocks Back in Production?"

[UEP previously] recommended that members molt and dispose of
flocks six weeks earlier than previously scheduled.
Since mid-May we have seen egg prices rise by 29 cents per dozen
and then begin to decline. From the early June peak price, we have
seen prices decline by 24 cents per dozen within 11 days. The
Urner Barry Midwest Large quote was at 58 cents on June 22nd
(the day this story was written) and 7 cents per dozen below the
unprofitable level on the same day a year ago. Have early molted
flocks come back into production? Did anyone follow the
recommendation to dispose of flocks six weeks early? Do these
wide market swings do a disservice to our customers? **Am I
wasting my time writing about this and urging producers to be
more responsive?  Egg producers, whether marketing shell egg
or egg products, are going to have to come to terms with the
oversupply problem.**
A producer wrote UEP saying: 'It is pretty obvious that the molted
birds from about six weeks ago are all back in production and we

know that we cannot expect the breakers to help us out as they are nearly self-sufficient and the dried inventories are at or near all time highs. We were wondering if a proposal to extend all molts by one additional week through Sept. would be a simple enough program to get everyone who molts to participate. It would not matter what length of molt you currently do, just extend it by one week. We think it would have a very positive impact on supply.'

179.    In August of 2006, UEP urged members to "stay the course" on manipulating molt schedules. "The Urner Barry quotes have recovered a little from their hopefully bottom levels of 2006 but we are still not out of trouble. The UEP Marketing Committee's recommendation for the weeks between Easter and Labor Day were to molt and dispose of flock six weeks earlier than previously scheduled. **Members are encouraged to stay the course for the next four (4) weeks.**"

180.    A January 2007 newsletter identified "UEP's Role In A Profitable Industry":

While recognizing that your cooperative can only do so much to help the industry be profitable, we do believe the UEP Board, Marketing Committee and staff must play a role in providing assistance. **Ways in which we hope we have provided assistance include:**
• **Supply-demand recommendations**
• **Annual Production Planning Calendar**
• Working with Urner Barry on price discovery and a quarterly PCT survery.
• Volume shell egg exports through the United States Egg Markerters membership.

181.    In February 2007, UEP evaluated "The Egg Market" and how to keep prices high:

**The best immediate answer to assure profitable prices is for the industry to show some restraint. Producing more eggs than the market demands at profitable prices is never good business and everyone should study their own personal supply/demand conditions and adjust accordingly.** Producers should especially pay attention to the period between Easter and Labor Day. We have a history of supplies exceeding demand during that period and we must change the pattern.
In discussions with two cage manufacturers UEP learned that this past year was a very slow year for cage sales and one company

50

suggested that it was the worst in history. In questioning of how many new houses or conversions were or will be completed between mid-year 2006 and mid-year 2007 we were provided with estimates of 20 new projects for an approximate 5.3 million hens – below normal replacements or expansions. We also learned that equipment for 200 layer houses for cage-free production have been or will be completed during the same period for an estimated 2 million hens. **One other positive change since the high egg prices during the fall of 2003 and spring 2004 is that the UEP Certified program does not allow for backfilling cages to replace mortality.**

A recent survey by Egg Industry and the results published in their Jan. 2007 magazine found 56% of the respondents saying they believer prices in 2007 will improve, 38 % expected prices to remain the same, with the balance expecting weaker prices. The survey participants ranked issues of **importance and identified overproduction (too many birds) as the top of the list of producer concerns. The Egg Industry Magazine again published their annual list of the largest egg companies showing 63 companies owning 86.9% of all the layers in the country. These are the companies that have the potential to have the greatest impact upon supply/demand conditions and can cause the most rapid changes for assured profits.**

182.   In March of 2007, UEP warned producers to lower production after Easter:

History tells us that we will begin to produce surplus eggs the week after Easter and continue until Labor Day. **The only way to avert this history and minimize the market decline is for shell egg producers to begin making plans NOW to molt or dispose of flocks.** Take a look at your personal history and learn how many surplus eggs you were producing that had to be sold to the Egg Clearinghouse, UEP, private brokers, or to the egg breakers. **Make the necessary adjustments.**

183.   An April 2007 newsletter discussed the availability of more effective supply

control measures: "Failure To Control Egg Supply Is Costing Billions. Can Something Be

Done?"

Over the past few months, Dr. David Roland, professor at Auburn University has shared ideas with UEP by which egg producers might adjust their egg supply to meet the market demand. The concept is completely foreign to the traditional thinking of

maximizing egg production but we feel it is worthy to include the following newsletter article written by Dr. Roland.

It makes no sense when losing money to continue optimizing production when the reason for losing money is excess eggs. This is especially true when new technology is available to reduce losses and egg supply at the same time.

**The objective of supply management (SM) is to prevent the over supply of eggs which can reduce egg prices. It is estimated that billions have been lost and will continue to be lost unless better methods of SM become available. UEP recognizes this and has promoted reducing hen numbers and molting to help control supply.** However, many peak in production after molt. A new program called Econometric Feeding and Management (EF & M) has been developed which allows producers to maintain hen numbers, optimize returns and at the same time help control egg supply. The EF & M program has 5 components (fee formulation, traditional feeding program, record keeping, econometric feeding and production control) integrated into a single program. . . .

In summary, the availability of Econometric Feeding and Production Control Programs along with hen reduction and molting should allow producers much more control over supply and profits. Although changing a century of feeding for maximum performance will be difficult and not without some learning pains, the potential gain in profits (literally billions) for even slight improvements in SM is too much for the industry to continue ignoring. For more information call Dr. Roland at (334) 844-2605."

184.    In August of 2007, UEP encouraged producers to molt earlier (which causes

chickens to stop producing eggs) to restrict egg supply:

Conditions, however, on July 31st had begun to show some market weakness with shell egg prices declining 5 cents per dozen. **It could be good timing for egg producers to take care of their business by disposing of or molting hens 2 – 3 weeks earlier than previously scheduled.**

185.    In September of 2007, Midwest Poultry acknowledged it would not be expanding

until "industry issues" were worked out:

Like many egg companies in 2007, this is not a year of expansion for Midwest Poultry Services, L.P. "Our goal is to keep the flock size where it's at," says Bob Krouse, president of the Mentone, Ind., firm.  While having no growth plans for the near term, longer

> term, **Krouse says that companies like his, one of the nation's top egg companies with 6 million layers, will have to grow to match the needs of expanding customers. But not for a while, and not before some major industry issues are worked out.**"[75]

186.    Midwest Poultry also acknowledged that the UEP guidelines were helping to keep supplies low and prices high:

> Krouse is optimistic on profits in the near term. 'Overall, I think the industry will be profitable over the next three years,' he says. One big reason why is animal welfare. . . .
> **Closely related, he says, is the capital outlay Midwest Poultry Services has invested over the past 5 years to increase cage space from 52 sq. in. to 64 sq. in. to meet new United Egg Producers animal welfare guidelines. Such shifts significantly contribute to why there was no surplus in eggs this summer, and strong profits for egg producers nationwide.**[76]

187.    In November of 2007, Larry Seger, chairman of United States Egg Marketers, acknowledged the agreement to restrict output.  In an interview in *Egg Industry*, he said "that he expects egg production to increase, but not a 'wholesale run' like what occurred in the 1980s and 1990s. **The industry has become more responsible on the production side, and, he says, the animal welfare guidelines will keep production from increasing substantially.** All this has been occurring, he says, 'with demand that is as strong as it's ever been.'[77]

188.    Craig Williardson, president and CEO of Mo-Ark, LLC, stated that "discipline, balance, steady demand, and of course, the normal cyclical factors following a very poor market period starting in mid-2004, have all played a role in 2007 looking so positive. **The industry has been able to better manage its production and its inventories; trades of surplus product are finding the right market homes. . .** "[78]

---

[75]    "Midwest poultry services looks to the future," Egg Industry, (Sept. 2007).
[76]    *Id.*
[77]    "2008: Lower prices than '07, but still a good year," Egg Industry (Nov. 2007).
[78]    *Id.*

189.    In January of 2008, *Egg Industry* examined the factors leading to the record

prices in 2007:

> The very bright factor coming out of 2007 and carrying into 2008
> is that the industry, both shell eggs and egg products, enjoyed
> record-breaking prices throughout the year. The good news was
> that egg producers and processors made money, despite high feed
> costs. It was evident at meetings and conferences held throughout
> 2007. **The key reason for a profitable 2007: Despite the fact
> that the U.S. population grew by some 3 million, the number of
> layers decreased by 4 million.  Fewer hens make for a better
> price at the marketplace.  In addition, egg producers
> maintained lower flock sizes to better accommodate the
> summer season, which historically has slower egg sales.  Egg
> producers also continued to maintain their schedules for the
> increase of cage space for their hens in compliance with the
> United Egg Producers (UEP) Certified Animal Welfare
> program.  This meant fewer hens housed, which brought the
> national inventory down.**[79]

190.    UEP's January newsletter noted discussed 2007's agreement to reduce output and

encouraged producers to keep the agreement in 2008:

> **Plan For Supply/Demand Between Easter and Labor Day**
> Egg farmers reviewed their history of supply/demand between the
> weeks of Easter and Labor Day as they planned to fill the market
> in 2007.  **Recognizing that historically, the industry produces
> more eggs during that period than the market demands, egg
> farmers made adjustments. Even with currently profitable
> prices, it would be good business in 2008 for producers to
> manage their supply during what historically has been the
> lowest demand period of the year.**

191.    In February of 2008, Dolph Baker, president of Cal-Maine Foods said: "[o]ur

forecast is that the supply side will be similar to 2007.  Prices in 2008 could be as good.  **What**

**we learned in 2007 is that we have control of our destiny if we work at it, and as an**

**industry, 2008 could be another super year.**"[80]

---

[79]    "Crystal ball has 2008 looking like another profitable year," Egg Industry (Jan. 2008)
[80]    "Infrastructure's role in keeping egg prices high," Egg Industry (Feb. 2008).

192.    Another article in the February 2008 issue of *Egg Industry* recognizes that the industry has kept prices artificially high through the case size restrictions:

> **Cage space attrition due to the requirements of the UEP guidelines and basic wear-and-tear have been the leading factors in keeping supply tight and prices high.** . . . One basic effect of the guidelines' required increase in cage space is that, overall, the industry has lost about 20 percent of space available in existing houses, a trend which will continue through April of 2010, when all cages in the UEP program will have to provide 67 square inches per bird and 29 percent of space present in 2002 has been lost. **Of course, all of these changes only apply to participants in the UEP certified program**, which includes 196 million cage spaces in the shell egg market and about 22 million in the egg product market, but for the time being this analysis focuses primarily on the shell egg market. **Thus, from 2002 to the present day, the shell egg industry has already lost 37 million cage spaces to the UEP guidelines alone.**[81]

193.    The article continued:

> How long our industry will remain profitable is always difficult to predict and subject to many different interpretations. This report is an attempt to provide one point of view and hopefully stimulate additional discussion on the subject.
>
> One important but unproven assumption we have made is that, with the Urner Barry large egg price over $1.60, every cage in the country that can hold a hen is probably full. If this is the case and we are as far behind in replacing older equipment as our numbers show, the industry has no way to increase production in the short term. **If producers continue to follow the UEP animal husbandry guidelines, as appears likely, we can not quickly increase flock size by placing an additional hen in each cage.** Planning and installing new cage equipment will take at least eight months to one year from beginning to end. Our basic conclusion is that whenever new construction begins on a large scale (and it does not appear to have started yet), we will have about one year of great egg prices before oversupply brings this exciting ride to an abrupt halt.[82]

194.    UEP's February 2008 newsletter again encouraged producers to reduce supply after Easter utilizing UEP's "Production Planning Calendar":

---

[81]    *Id.*
[82]    *Id.*

Historically, retail egg demand is at its lowest level during the weeks between Easter and Labor Day. UEP's Production Planning Calendar reports the supply/demand index at 88.8% during the months of April through August. Using 100% as a balance between supply and demand indicates that the industry produces a larger supply than demand during those months. **Egg producers should strive to manage their supply to meet the market demand for both the lower and higher demand periods. Producers are encouraged to quickly review their individual company history and, if needed, adjust their egg production to meet the expected demand between the weeks of Easter and Labor Day.**

195.   In May of 2008, Midwest Poultry acknowledged that producers were sticking to

UEP's guidelines:

'When you look at the number of birds and the number of cage spaces we'll lose to animal welfare (UEP's program), it looks like prices for this year will look pretty similar to last year,' says Bob Krouse, president of Midwest Poultry Services, Meltone, Ind. **'The only way (the industry) could expand would be if people abandoned the UEP program and I don't see that happening.'** .... So far, he has not seen any slackening of demand, and he believes that egg demand is largely inelastic unrelated to price. Helping egg demand in the face of high prices, he says, 'is that all price prices are high. I don't see demand for shell eggs going down.'[83]

196.   In June of 2008, Gene Gregory of UEP acknowledged their supply management

program was working:

Managing Supply - Producers should be profitable the last quarter of the year if not before, Gregory says. He looks for the flock size in 2008 to average 1 million to 2 million birds more than 2007. Much of what Gregory is seeing is producers who are remodeling with existing buildings rather than putting up new complexes. **'We're doing a better job managing supply,' he adds.**[84]

197.   In July of 2008, Gene Gregory discussed his "Egg Industry Concerns" in the UEP

newsletter:

---

[83]   "Executives optimistic on prices," Egg Industry (May 2008).
[84]   "Second half of 2008 still looks profitable," Egg Industry (June 2008).

56

With the current level of feed and fuel costs, I'm concerned about whether our industry can continue to manage our business to be profitable. **With the increased pullet hatch over the past 17 months, I'm concerned about whether we are building a flock size that moves the egg supply over into the surplus category and therefore prices below the costs of production.** I'm concerned when I see corn prices have gone from $2.00 per bushel to $7.00 per bushel and **knowing we have no way to pass the cost on other than managing our egg supply.**

I'm concerned when I see Don Bell's latest forecast of 291.1 million hens by December 1st and averaging 289 million for the first five (5) months of 2009. **We have proven that we can have a responsible industry with 280 to 285 million hens but can we afford the increase of 5 to 10 million more hens.**

. . . .

**I'm concerned with I see the supply side of our business currently greater than the demand side and surplus eggs are readily available at discounted prices.** This is certainly not good when considering the increased feed and fuel costs impacts. **I would therefore suggest that if you have any flocks with a planned molt schedule within the next few weeks that you move up the schedule a week or two.**

In early May the members of United States Egg Marketers made the sale of 100 containers of eggs for export. The market moved up 30 cents per dozen from what were possibly breakeven prices at the time of the sale. Since July 1st we have seen prices declining to breakeven or unprofitable price levels. **We cannot always export ourselves out of a bad situation and therefore I'm concerned about whether egg farmers are paying close attention to supply/demand conditions and future projections.**

I'm concerned when I see that the broiler industry is unprofitable and companies are not hatching breeding stock eggs. Instead these eggs are finding their way into egg-industry breaking plants. **I'm concerned when I hear rumors of expansion that could add 10 to 12 million hens to our nation's flock inventory** at a time when feed and fuel costs are extremely high and likely to go even higher.

198.   In August of 2008, UEP conducted a "Molt Survey" of its members and shared

the results:

In trying to understand why we are seeing the increased monthly chick hatch, we have conducted a molt survey. Because of UEP's new animal welfare guidelines for molting, we questioned whether some companies have reduced their number of flocks being

molted. We also question whether profitable egg prices may have caused some companies to change their molt schedules or given up molting altogether. If not a change in molting practices, then this would point to the fact that we are creating expansion with new buildings or remodeled buildings with a larger house population. The findings of the molt survey are as follows:

• 74 companies with ownership of 152.8 million hens participated. This represents about 54.6% of the nation's current flock inventory.

• 52 companies reported that they have molted all flocks in the past and have not changed their production practices.

• 11 companies reported they have not molted in the past and have not changed.

• 1 company owning 1.1 million layers reported they have discontinued molting their hens.

• 10 companies reported having changed molted practices by reducing the number of flocks placed in molts. The companies provided the percent of fewer hens being molted. When multiplied by the % times the number of hens for each company, this represents 6.1 million fewer hens being molted.  Adding the 1.1 million and 6.1 million hens gives us 7.2 million fewer hens being molted out of a total of 153 million.

Let's compare USDA's monthly report of hens in a molt and those with a completed molt for the first six (6) months of 2008 versus 2007. The percentage of hens in a molt in 2008 averaged 3.08% versus 3.75% in 2007. The percentage of hens having completed a molt averaged 21.5% in 2008 versus 23.8% in 2007. This tells us that there are fewer hens being molted in 2008. The percentage of hens having completed a molt would represent about 6.5 million of the nation's layer flock.

So both UEP's survey and USDA statistics confirm that fewer hens are being molted and with fewer hens being molted this would require an increased chick hatch.

Over the past 17 months we have seen the chick hatch increase by 14 million pullets. Based upon my limited understanding, it would be my opinion that we still have a great deal of expansion going in this year and early 2009.

**Over the past few days I've heard from two companies in regard to our current projections for flock size. One company reported that they had plans and permits to build several houses and have now stopped with those completed or under construction. Another company reported that they had discussed potential flock expansion but have decided not to expand and hopes the rest of the industry does the same.**

### 4.   UEP's Animal Husbandry Guidelines Are a Pretext For a Naked Price-Fixing Scheme

199.    The UEP and co-conspirators' supply control campaign starts with the fee-based "UEP Certified" logo and misleadingly termed "animal husbandry guidelines." UEP created the UEP Certified program as a front and pretext for a naked price fixing agreement and an anticompetitive output restriction scheme. Beginning in 2000, UEP and its co-conspirators began implementing the conspiracy through a series of carefully planned collaborative steps under the pretext of animal welfare. The UEP Certified program's primary purpose and admitted "projection" was to provide a front for the egg industry's separate horizontal agreement to reduce output by not replacing hens lost through the use of bigger cages.

200.    The UEP's certification guidelines are a sham and have no basis in animal husbandry, nor do they promote competition.

201.    The UEP Certified program features a trademarked logo which companies can license for a fee. UEP Certified companies are permitted to display the UEP Certified logo on their packaging and to market their eggs as "United Egg Producers Certified." The company may also authorize retail customers to use the logo. All UEP Certified eggs must also be marketed with the phrase "Produced in Compliance with the United Egg Producers' Animal Husbandry Guidelines."[85]

202.    UEP holds its guidelines out as a "comprehensive and progressive animal care program . . . developed from guidelines established by an independent advisory committee of some of the top animal welfare and behavioral scientific experts in the U.S."[86] However, UEP used the standard setting process to entrench existing industry practices and reduce output. Thus

---

[85]    United Egg Producers, Animal Husbandry Guidelines for U.S. Egg Laying Flocks, at 24 (2008).

[86]    United Egg Producers Certified: We Care, http://www.uepcertified.com/ (last visited June 2, 2008).

the animal husbandry guidelines are a pretext for UEP's long-attempted goal of restricting hen populations nationwide and thereby increasing the industry's bottom line.

203.    The cartel's supply control guidelines are based on a simple premise: egg producers make more money when there are fewer hens in production.[87]

204.    UEP has successfully reduced the size of the U.S. laying flock by agreeing with companies not to replace lost capacity and using the policing mechanisms that are built into the UEP Certified program to punish producers who violate certain key provisions.  Strict obedience to these key supply control campaign is necessary in order to ensure the success of the scheme. For that reason, rules that affect hen populations are the only rules UEP enforces.  Guidelines that do not have a direct impact on hen populations – including those that purportedly address humane treatment – are flouted with impunity.

205.    For example, toxic ammonia concentrations, cruel killing methods and failure to remove dead birds from cages daily will only cost producers a five (5) point deduction on their annual audit.  In contrast, UEP has a zero tolerance, automatic failure policy for producers that violate cage spacing formulas, engage in a procedure known as "backfilling" (replacing hens for losses due to mortality) and starvation induced molting (to increase egg production).[88]

206.    By vigilantly enforcing only those UEP Certified rules which limit hen populations, agreeing not replace lost capacity, and through other means not related to the Certification guidelines, UEP has reduced the size of the laying flock nationwide and in turn the

---

[87]     R. Smith, *Cage Space Hardest of Hen Welfare Needs to Evaluate*, Feedstuffs, Mar. 12, 2001, at 1 (citing Don Bell's research showing that a decrease in flock size by 1 million hens increases prices 1 cent/doz.).

[88]     The practice of backfilling cages is done by placing different aged birds in cages to replace birds who have died to maintain a full house at all times. Backfilling has long been known to compromise hen welfare. Research has shown that mixing birds from different flocks increases susceptibility to disease and to increase stress and aggression.

number of eggs produced.  The resulting limits on output have allowed UEP and its co-conspirators to reap record profits as egg prices have skyrocketed to historic highs.

207.    UEP relies heavily on the role of the "independent scientific advisory committee" to lend their guidelines the facial appearance of legitimacy and neutrality.

208.    For example, in 2007 UEP's president, Gene Gregory, testified before a House Subcommittee in regard to the "scientific advisory committee" stating,

> [T]o ensure its objectivity, the committee did not include any producers as members. The scientific committee recommended significant changes in egg production practices. UEP accepted the recommendations and today about 85% of our industry has implemented them. [ ] As the years have gone by, the scientific committee has made a number of additional recommendations. UEP has never rejected a recommendation by the committee – a remarkable track record that reflects our industry's determination to follow the best available science. [ ] The committee's recommendations became what is now known as the UEP Certified Program.[89]

209.    However, Gregory omitted important information and misstated the facts about the role of this committee.

210.    The "independent scientific advisory committee" ("scientific committee") did not write the animal husbandry guidelines.  UEP's "animal welfare committee," which is made up entirely of egg producers, authored the guidelines utilizing Don Bell's economic analyses as their primary motivating factor – not animal husbandry.[90]

---

[89]    Statement of the United Egg Producers: Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong. (2007) (statement of Gene Gregory, President, United Egg Producers).

[90]    *See also* United Egg Producers, Animal Husbandry Guidelines for U.S. Egg Laying Flocks, at 2 (2006) ("The recommendations and guidelines found within this document have been accepted by and presented here by the Producer Committee using the recommendations from the Scientific Committee as a blueprint."). *See also* Don Bell, Don Bell's Table Egg Layer Flock Projections and Economic Commentary (July 16, 2002) (the report was made "under the sponsorship of United Egg Producers" and states "United Egg Producers has developed a set of cage space standards with the help of a scientific advisory committee and a producer animal

211.   The scientific committee was asked to review literature on specific topics and to develop recommendations based on existing management and husbandry practices and to make "recommendations for revision of [the] industry's animal care guidelines."[91]  Gregory claims that UEP accepted the recommendations of the scientific committee in their entirety, but UEP has never released the recommendations to the public.

212.   The committee's recommendations were also constrained by limited data.  Two members of the scientific committee, Dr. Joy Mench and Dr. Janice Swanson, wrote that, "a different decision about the minimum [space] recommendation would have been reached had the committee given more weight to the information from the preference testing and use of space studies, since these indicate that hens need and want more space than 72 sq. in."[92]

213.   Gregory maintains that the scientific committee recommended "significant changes in egg production practices."  However, by June 2002, just six months after the program was announced, 135 companies had already attained "UEP Certified" status.[93]  By July 2003, 136 companies had been audited and only one failed – a 99 percent passage rate.[94]  The stunning swiftness with which egg producers complied with the guidelines belies UEP's assertion that the program required any "significant changes."

214.   During the standard setting process, UEP maintained a commitment to avoid, where possible, the introduction of welfare-driven production practices and maintain the status quo in order to offer a pre-textual "legitimate" front to its scheme to fix prices.  UEP's

---

welfare committee."). Donald Bell is a member of the "independent scientific advisory committee."

[91]     Testimony of Gail C. Golab, PhD, DVM, Before the Subcomm. On Livestock, Dairy, and Poultry of the H. Comm. on Agriculture, 110th Cong. (2007).

[92]     Joy Mench, Janice Swanson, "Developing Science-Based Animal Welfare Guidelines." A speech delivered at the 2000 Poultry Symposium and Egg Processing Workshop.

[93]     Press Release, Food Marketing Institute, U.S. Egg Industry Introduces Sweeping Changes to Animal Welfare Standards (June 27, 2002).

[94]     United Egg Producers, United Voices, July 2, 2003 at p. 1.

certification program is not a legitimate attempt to improve product quality, innovation or service and is instead, a sham and pretext for its naked price fixing agreement to reduce output.

215.    One UEP guideline provides that birds should have adequate access to feed troughs although, not necessarily feed.  This is because as originally written by the UEP producer-members the guidelines did not prohibit an industry practice known as "feed withdrawal forced molting" where birds are starved for days or weeks to profitably manipulate the laying cycle.[95]

216.    Molting is done strictly for economic reasons to manipulate egg supply: "induced molting offers a means of matching the egg supply with market conditions. ... [I]nduced molting offers distinct economic advantages to the commercial egg industry."[96]  The only conceivable reason forced molting was permitted under the UEP Certified program in 2002 was for economic and market manipulation reasons.

217.    Members of UEP's own scientific committee opposed forced molting.[97] However, it was not until UEP was able to fund research that discovered economically viable

---

[95]    Poultry researcher and member of UEP's scientific committee Donald Bell recommends complete feed withdrawal for a period of ten (10) to fourteen (14) days during a starvation induced molt. See Donald D. Bell, Poultry Fact Sheet No. 5: General Molting Recommendations, University of California Cooperative Extension. According to Bell, "[forced molting] is done to lengthen the productive life of flocks and to improve profits in egg production." Donald Bell, Economics of Alternative Replacement Programs, Egg Economics Update (University of California Cooperative Extension, Riverside, CA), Apr. 20, 2000 ("[forced molting is] done to lengthen the productive life of flocks and to improve profits in egg production."). In UEP Memo No. 35 titled, High Egg Prices and Molting: How Egg Prices Affect the Decision to Molt, Bell noted that molting was only justified when prices were low and costs of replacement chicks were high. Donald Bell, Don Bell's Table Egg Layer Flock Projections and Economic Commentary (Dec. 10, 2003).  The memo was written "under the sponsorship of the United Egg Producers."
[96]    John B. Carey and John T. Brake, Induced Molting as a Management Tool, North Carolina State University/North Carolina Cooperative Extension (Feb. 1987).
[97]    In a letter to the editor in Poultry Science, June 2002, "Does Hunger Hurt?," Dr. Ian Duncan and UEP scientific committee member Joy Mench agreed that "withholding feed for 21 days from an animal that normally eats every day meets the biological definition of 'starvation.' ...[I]ncreased aggression suggests severe frustration and the increased non-nutritive pecking,

ways to induce molting by feeding birds waste products such as grain hulls (essentially empty calories mixed with a flavoring agent for palatability) that UEP disapproved of feed-withdrawal forced molting.

218.    Because feed-withdrawal forced molting is such a powerful device for market manipulation, it is among one of only four circumstances under the current guidelines that will cause automatic failure during an audit. This underscores UEP's primary motivation for adopting the UEP Certified program – to implement and police compliance with its supply control scheme.

219.    The UEP Certified program has built in reporting mechanisms that allow the cartel to monitor compliance and ensure members are not cheating. In addition to hen flock size restrictions, UEP uses "Economic Alerts," "Production Planning Calendars," "Processing, Cartoning and Transportation forms," "hatch schedules," monthly and annual audit reports, industry meetings, and newsletters as scorecards to police compliance.

220.    UEP and its co-conspirators are also able to force compliance with the scheme by convincing retailers to only buy "UEP certified" eggs. If an egg producer does not sign on the agreement, they may not be able to market their eggs or sell them through many major retail outlets.

221.    Shortly after the program was adopted two major retailers, The Kroger Co. and Wal-Mart Stores, Inc. indicated that starting January 1, 2003, they would only buy UEP Certified eggs. Other retailers were expected to "follow the Kroger/Wal-Mart lead in short time, making 100% compliance not only a program strength but necessary and practical."[98]

---

some of which was stereotyped, suggest severe frustration and extreme hunger, and the reduced activity suggests debilitation."

[98]    "Egg producers put husbandry program into motion as early model for others," Feedstuffs (Nov. 4, 2002).

222.    Here, UEP has implemented its scheme through a number of different acts, including entering into agreements to reduce egg production according to a calculated formula and phase-in schedule.  By agreeing to reduce hen populations and to refrain from expanding operations, UEP members were able to substantially reduce the size of the U.S. laying flock per capita.

223.    Fred Adams, founder and chairman of Cal-Maine Foods, described the impact of the UEP Certified campaign and boasted about the success of the "agreement" reached in the industry:

> [B]asically the agreement was that we would give the chickens more space in the laying cages.....The net effect of that was reducing the number of laying hens in existing facilities by some 20%. [ ] This is been a very successful program . . . .[99]

224.    The cartel used their illegal conspiracy and unlawfully-acquired market power to suppress competition through an overarching, deceptive and exclusionary scheme designed to reduce output and to fix and raise the price of eggs sold in the United States at artificial and supracompetitive levels.  While publicly UEP has indicated that the certification guidelines were adopted to promote animal husbandry, in reality they were secretly adopted as a "roadmap" to allow the industry to reduce output and fix prices.  Further, the agreements not to replace lost capacity through cage increases have no justification in animal husbandry and were implemented solely to further the cartel's scheme to maintain prices at supracompetitive levels.

## 5.    UEP Also Reduced Supply By Selective Exportation of Eggs, Thereby Increasing Domestic Prices.

225.    UEP and its members also conspired to keep egg prices high in the U.S. by causing eggs to be exported abroad at a loss. By removing a small fraction of eggs that would

---

[99]    Audio Recording: Presentation by Fred Adams for Cal-Maine Foods, Inc. Stephens Spring Investment Conference (June 4, 2008).

have been bound for U.S. sales and arranging instead for their export, UEP helped tighten domestic supply and drive up the price of eggs across the country.

226.    After three years without significant exports, United Egg shipped nearly 100 container loads, or 24 million dozen fresh eggs, to Europe and the Middle East at the end of 2006 and early 2007. Each member was required to provide a share of the sale, prorated by flock size. The orders were sold at below the prevailing U.S. price for fresh eggs. UEP credited the campaign with helping to boost domestic egg prices, which rose more than 40% in the next year. Gene Gregory said export orders amounted to less than 2% of industry output. "But it is amazing how one or two percent can have an effect on the rest of your domestic price," he said.

227.    When egg prices began to soften in March of 2008, UEP put together another export order. It sent 100 container loads, this time to buyers in Japan and Iraq, again selling them at well below the domestic price. U.S. egg prices shot up again in the summer. UEP says it is in the process of shipping 120 more container loads.

**6.      Grand Jury Investigation Into The Egg Industry.**

228.    The United States Department of Justice, acting through a grand jury convened in Philadelphia, is conducting an investigation of anticompetitive practices in the egg industry.

229.    On September 23, 2008, it was revealed that the three largest U.S. egg processors have received grand-jury subpoenas. The criminal investigation is focused on the pricing and marketing of eggs and egg products. Defendants Golden Oval, Michael and Moark LLC have each confirmed that they received subpoenas, sent by the U.S. Attorney in Philadelphia, covering the years 2002-08. Golden Oval said it is cooperating with the U.S. inquiry; MoArk also is cooperating. A Michael executive also declined to comment and said the company is responding to the government's requests.

## VIOLATIONS ALLEGED

## Section 1 of the Sherman Act, 15 U.S.C. § 1

230.    Plaintiff incorporates by reference as if fully set forth herein, the preceding allegations of this Complaint.

231.    In response to market conditions, and in an effort to stem declining prices and artificially inflate the prices of eggs, beginning at least as early as 1999, the exact date being unknown to plaintiff, and continuing thereafter through the present, the defendants and their co-conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, which had the purpose and effect of fixing, raising, maintaining and stabilizing the prices of eggs at artificially high, non-competitive levels in the United States.

232.    The aforesaid combination and conspiracy between and among the defendants and their co-conspirators was furthered and effectuated, among other ways, in the following manner:

(a)    Throughout the 1990s, eggs prices could not be maintained due to a fluctuating imbalance of supply over demand - after spurts of high prices, producers were add more production capacity and prices would fall again.

(b)    Against this backdrop, UEP communicated with and acted in concert with its member competitors and non-member conspirators and conspired and combined to effectuate a substantial reduction of the production and supply of eggs, which allowed for a series of substantial increases in eggs prices.

(c)     As part of defendants' strategy to increase the price of eggs, the UEP, its members, and non-member co-conspirators drafted guidelines with animal husbandry as pretext, but with the knowledge and understanding that the guidelines would be used by the co-conspirators to substantially reduce egg production; manipulated molting schedules to keep productions low; reduced chick hatching; coordinated with co-conspirators to reduce or delay the introduction of added egg capacity through the construction of new farms; and reduced production rates at existing eggs farms.  These actions were extraordinary, non-competitive, and contrary to economic fundamentals.

(d)     Defendants also conspired to increase domestic prices for eggs by making selective exports of eggs abroad at below cost.

(e)     To maintain the supracompetitive price of eggs, defendants took significant steps throughout 2000-2008, which resulted in record high prices for eggs throughout this period.

233.    For the purpose of effectuating the aforesaid combination and conspiracy, the defendants and their co-conspirators:

(a)     agreed among themselves to fix, raise, maintain and stabilize the prices of eggs in the United States;

(b)     agreed among themselves to restrict the supply of eggs by implementing and coordinating output restrictions at their egg farms and exporting eggs abroad; and

    (c)       agreed among themselves to implement and coordinate increases in the prices of eggs in the United States.

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

234.    The aforesaid conspiracy had the following effects, among others:

    (a)       Price competition among the defendants and their co-conspirators in the sale of eggs was restrained and suppressed;

    (b)       Prices of eggs manufactured and sold by the defendants and their co-conspirators in the United States were fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

    (c)       Buyers of eggs from the defendants and their co-conspirators, including plaintiff and class members, were deprived of the benefits of free and open competition in the purchase of eggs.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

235.    As a direct and proximate result of the combination and conspiracy alleged herein, plaintiff and other members of the Class were, and continue to be, damaged in their business or property in that they paid more for eggs during the Class Period than they would have paid in the absence of such combination and conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment against defendants as follows:

    (a)       Declaring this action to be a proper class action pursuant to the Federal Rules of Civil Procedure on behalf of the Class as defined herein;

(b)    Declaring that the unlawful combination and conspiracy alleged herein be

adjudged and decreed to be in unreasonable restraint of trade or commerce

in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

(c)    Declaring that plaintiff and the Class recover treble their damages as

caused by the conspiracy alleged herein, as provided by law, and that

judgment in favor of plaintiff and the Class be entered against defendants

in that amount;

(d)    That plaintiff and the Class recover their costs of this suit, including

reasonable attorneys' fees and costs, as provided by law; and

(e)    That plaintiff and the Class be granted such other and further relief as the

nature of the case may require or as may seem just and proper to this

Court.

## **TRIAL BY JURY**

Trial by jury is demanded on all issues so triable.

September 25, 2008

*Brent W Landau*
Brent W. Landau
Pennsylvania Bar No. 202189
COHEN, MILSTEIN, HAUSFELD
   & TOLL P.L.L.C.
255 S. 17th Street
Suite 1307
Philadelphia, PA  19103
Telephone:     267-773-4680
Facsimile:     267-773-4690

Michael D. Hausfeld
James J. Pizzirusso
COHEN, MILSTEIN, HAUSFELD
   & TOLL P.L.L.C.

70

1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone:      (202) 408-4600
Facsimile:      (202) 408-4699

Michael P. Lehmann
COHEN, MILSTEIN, HAUSFELD
  & TOLL P.L.L.C.
One Embarcadero Center
Suite 2440
San Francisco, CA 94111
Telephone:      (415) 229-2080
Facsimile:      (415) 986-3643

Steven A. Kanner
FREED KANNER LONDON &
  MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone:      (224) 632-4500
Facsimile:      (224) 632-4521

Arthur N. Bailey
ARTHUR N. BAILEY &
  ASSOCIATES
111 West Second Street, Suite 4500
Jamestown, NY 14701
Telephone:      (716) 664-2967
Facsimile:      (716) 664-2983

Attorneys for Plaintiff and the Class